**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
CIRA CALABRESE, et al.,

                           Plaintiffs,

              - against -

CSC HOLDINGS, INC., et al.,

                          Defendants.
-----------------------------------------------------------X

          **CORRECTED**
          **REPORT AND**
          **RECOMMENDATION**

          CV 02-5171 (DLI) (JO)

**JAMES ORENSTEIN, Magistrate Judge:**

      Seven named plaintiffs, purporting to act on behalf of themselves and others, have

accused defendant CSC Holdings, Inc. ("CSC") and others of injuring them by prosecuting

meritless claims arising from their alleged acquisition of "pirate" cable television decoder

devices. *See* Docket Entry ("DE") 163 (Fourth Amended Complaint) ("Complaint"). When the

plaintiffs first sought class certification in 2003, DE 22, the court denied their motion without

prejudice to renewal because they failed to demonstrate that putative class members are so

numerous that the case should be prosecuted as a class action. DE 46 (Memorandum and Order

dated September 5, 2003) ("*Class Cert. I*") at 6-7. After more than five years of protracted

litigation the case has come full circle and the plaintiffs have now moved again for class

certification. DE 333. The Honorable Dora L. Irizarry, United States District Judge, referred the

motion to me for a report and recommendation. I now make my report and, as explained below,

respectfully recommend that the court deny the renewed motion with prejudice. Briefly stated,

the development of a fuller record over the past several years has confirmed that the putative

class is not so large as to warrant certification. In addition, an intervening change in both the law

of this circuit and the available facts persuades me that the court should now find, on

reconsideration, that this case is not of a type that can properly be certified for class adjudication.

I.      Background

        The factual background and procedural history of this case have been described at length

in various orders issued by the court over the past several years.  *See*, *e.g.*, *Calabrese v. CSC*

*Holdings, Inc.*, 283 F. Supp. 2d 797, 804-06 (E.D.N.Y. 2003) ("*Calabrese I*") (granting in part

and denying in part defendants' motions to dismiss); *Calabrese v. CSC Holdings, Inc.*, 2006 WL

544394, at *1-3 (E.D.N.Y. Mar. 6, 2006) (Memorandum and Order granting in part and denying

in part the plaintiffs' motion to strike portions of the defendants' answers).[1]  The following

recitation draws heavily from those earlier decisions, but focuses on those aspects of the case's

history that are relevant to deciding the instant motion.

        The dispute underlying this litigation is relatively straightforward, and arises from CSC's

efforts to combat the use of "pirate" decoder devices.  Such devices permit the user to view

encrypted cable television programs that would normally be available only by means of paying a

fee to a provider such as CSC.  In particular, an individual who is already a subscriber of

Cablevision's least expensive package of programming can use such a device to access additional

programming that would normally be available only in exchange for the payment of a premium

(either a higher monthly subscription fee or a one-time payment for access to a pay-per-view

program).  Using a decoder for such purposes constitutes a violation of the Federal

Communications Act of 1934, as amended, 47 U.S.C. §§ 553(a)(1) and 605(a) (the "FCA" or

"Communications Act"), and CSC has made a regular practice of bringing lawsuits in this court

and elsewhere claiming damages for such violations.  The cases often result either in a settlement

---

[1]  An intervening decision between the two cited above did not have a lengthy discussion of the
factual and procedural history.  *See Calabrese v. CSC Holdings, Inc.*, 2004 WL 3186787 (July
19, 2004) ("*Calabrese II*") (granting in part and denying in part defendants' motions to dismiss).

or a default judgment in an amount of several thousand dollars or more. *See generally CSC Holdings, Inc., v. Bokee*, CV 04-5434 (ADS) (JO), DE 12 (E.D.N.Y. Mar. 1, 2006) (providing details about Cablevision's FCA enforcement litigation practices). In pursuing its enforcement strategy, CSC has been assisted by the other defendants in this case, who include certain CSC employees and CSC's collection agency (collectively with CSC, "Cablevision"), as well as the law firm that served as CSC's outside counsel in making certain claims and several of that firm's attorneys (collectively, the "Firm").

The plaintiffs assert that Cablevision's litigation practices, as enabled by the Firm, amount to a racketeering scheme carried out through acts of fraud and extortion. In essence, they claim that the defendants would accuse subscribers who made only innocuous use of decoder devices (or no use of them at all) of violating the FCA without adequately investigating the truth of such accusations; they further contend that the defendants would then make a carefully calibrated demand of payment to settle the spurious claim. By doing so, the plaintiffs allege, Cablevision and the Firm forced such innocent individuals to choose among three unattractive options: paying a few thousand dollars to settle an unjust claim, spending even more in litigation costs to mount a successful defense, or being subjected to a potentially even larger default judgment. Some victims of the alleged scheme perceived the first option as the lesser evil and therefore made a settlement payment, while other needlessly spent their money on attorneys' fees. *See generally* Complaint ¶¶ 24-34.

Cablevision responds in essence that it engaged in legitimate efforts to combat the theft of cable services, and indeed expresses considerable skepticism that there is any such thing as innocent possession of a decoder device. *See generally* DE 184 ("Cablevision's Answer"); *see*

*also* DE 189 ("Firm's Answer").  It further argues that the claims of two of the named plaintiffs –

Mel Gevanter and Ralph Reel – are barred as a result of settlement agreements those plaintiffs

previously executed with Cablevision.  *See* DE 334 (Cablevision's Memorandum of Law in

Opposition to Plaintiffs' Motion for Class Certification) ("Opp.") at 16-17.  Cablevision therefore

denies engaging in any fraudulent or extortionate scheme and raises defenses based on its

constitutionally protected rights to engage in free speech and to petition the government for

redress of its claims as well as on the plaintiffs' allegedly unclean hands.[2]

The plaintiffs filed their initial complaint on September 24, 2002, alleging that the

defendants conspired to extort settlements from cable subscribers in violation of the Racketeer

Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq*. ("RICO").  DE 1.  A month

later, the plaintiffs amended their complaint as of right before an answer had been filed.  DE 3.

The month after that, the defendants moved to dismiss the amended complaint pursuant to Rules

9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.  DE 8; DE 12.  The plaintiffs cross-

moved for class certification pursuant to Federal Rule of Civil Procedure 23.  DE 22.

By order dated August 13, 2003 the court dismissed without prejudice the plaintiffs'

RICO claim under 18 U.S.C. § 1962(a) (alleging that the defendants invested the proceeds of a

pattern of racketeering activity in an enterprise) but denied the motion to dismiss the claims

under subsections (c) and (d) of the same statute (*i.e.*, those alleging, respectively, that the

defendants conducted the affairs of an enterprise through a pattern of racketeering activity and

---

[2]  The Firm initially responded to the plaintiffs claims with similar arguments and defenses, and also asserted its own counterclaim against Gevanter for violation of the settlement agreement (the "release" clause of which the Firm was a third-party beneficiary).  The plaintiffs have since reached a settlement in principle with the Firm, which therefore has not responded to the instant motion.  *See* DE 323, DE 325.

that they conspired to do so).  *See Calabrese I*, 283 F. Supp. 2d at 815.  In finding the latter

claims sufficiently pleaded, the court held that the plaintiffs had adequately alleged that the

defendants engaged in mail- and wire-fraud.  *Id*. at 808-09.  However, the court dismissed

(without prejudice) the portion of the plaintiffs' RICO claims predicated on a theory that the

defendants had engaged in unlawful extortion in violation of the Hobbs Act, 18 U.S.C. § 1951,

on the ground that they had not sufficiently alleged interference with interstate commerce.  *Id*. at

810.

A few weeks later, the court denied the cross-motion for class certification on the ground

that the plaintiffs had thus far failed to demonstrate that putative class members are so numerous

that the case should be prosecuted as a class action.  *Class Cert. I*; *see* Fed R. Civ. P. 23(a)(1).

At the heart of the decision was a fundamental rejection of the plaintiffs' inflated definition of the

proposed class.  Specifically, because the only viable portions of the RICO Act claims relied on

an assertion that the defendants had committed a fraud, each member of the putative class would

be required to "establish that he relied upon a misrepresentation made by the defendant to his

detriment."  *Class Cert. I* at 5.  In the context of the plaintiffs' claims, that misrepresentation

would have to be that the mere possession of a pirate device would suffice to prove a violation of

the FCA.  A person who had *actually* violated the FCA by using a pirate device for an illicit

purpose would not have had occasion to rely to his detriment on such a misrepresentation, and

therefore could not assert a valid RICO claim against the defendants.  As a result, the only

persons who could qualify for membership in the putative class were those who could in good

faith make three factual allegations:  that the defendants represented to them that the mere

purchase of a decoder was illegal, that they relied on such an inaccurate representation to their

detriment (by spending money to settle the case or to hire an attorney to defend it), and that they did not use a decoder to obtain unauthorized access to cable programming service. *Id*. at 5-6.[3]

Having defined the group of persons who could properly assert the same viable fraud-based RICO claims as the named plaintiffs, the court went on to consider whether it was large enough to justify class certification. The court found "no indication" that anyone other than the named plaintiffs themselves were within the putative class, and therefore denied the motion. *Id*. at 6.

Although the analysis up to that point sufficed to dispose of the motion for class certification, the court proceeded to discuss the plaintiffs' arguments with respect to the remaining elements of class certification. Starting with the concededly counter-factual assumption "that the Plaintiffs had in fact satisfied the numerosity requirement," *id.* at 7, the court concluded that each remaining requirement had been met. *Id.* at 7-17. As will become evident below, the extent to which the latter part of the court's analysis constitutes the dispositive law of this case is very much in dispute in the instant motion.

Following the court's rulings on the cross-motion, the plaintiffs filed a Second Amended Complaint, and then, with the defendants' consent, filed a Third Amended Complaint on October 8, 2003. *See* DE 43; DE 47; DE 49; DE 54. The defendants then moved again to dismiss, raising

---

[3] The court referred exclusively to damages resulting from fraud because the plaintiffs had not yet, at the time of the decision, amended their complaint to include allegations of extortion under the Hobbs Act. The court later extended its reasoning to reach the extortion claims, concluding that the threat of a meritorious claim under the FCA would not satisfy the element of a Hobbs Act violation requiring the use of wrongful means to achieve a wrongful objective. *See Calabrese II*, 2004 WL 3186787, at *6 ("*only* those customers who did not actually use the decoder box will be able to show an injury from the alleged extortion[, as a result of which] they will be the only customers who may qualify as putative class members") (emphasis in original).

substantially the same grounds as before. *See* DE 68. On July 19, 2004, the court again dismissed the plaintiffs' claim under 18 U.S.C. § 1962(a) – this time with prejudice – and again denied the defendants' motion with respect to the plaintiffs' claims under subsections (c) and (d) of the same statute. *Calabrese II*, 2004 WL 3186787, at *13. This time, however, the court found that the plaintiffs had sufficiently pleaded a violation of the Hobbs Act – as well as the mail- and wire-fraud claims that had previously withstood the defendants' challenges – as a predicate racketeering act in support of their viable RICO claims. *Id.* at *7. The plaintiffs filed the Fourth Amended Complaint – the pleading on which they now rely, to which I will refer simply as the "Complaint" – on September 30, 2004. Cablevision and the Firm answered on November 3 and December 3, 2004, respectively.

As the preceding paragraphs suggest, the parties spent the years following the rulings in *Calabrese I* and *Class Cert. I* engaged in continued challenges to each other's pleadings, as well as rehashing issues that the court had already – and in some instances repeatedly – decided. *See* DE 68 (defendants' second motion to dismiss); DE 204 (plaintiffs' motion to strike portions of defendants' answer); DE 51 (motion for reconsideration); 60 (same); DE 87 (same); DE 143 (same); DE 149 (same); DE 157 (motion for reconsideration of order denying motion for reconsideration); DE 160 (notice of interlocutory appeal); DE 196 (same); DE 194 (notice of interlocutory cross-appeal).

The parties also spent much of that time fighting over discovery. In particular, discovery related to the issue of numerosity took on particular importance in light of the analysis in *Class Cert. I*. Prior to that ruling, the magistrate judge to whom the case was then assigned ordered discovery to proceed in stages, with written discovery concerning the claims of the named

7

plaintiffs taking place in "Phase I" and depositions being conducted in "Phase II."  DE 37.  As a result of the decision in *Class Cert. I*, however, the magistrate judge expanded the scope of Phase I discovery to include numerosity.  DE 58 (order dated Oct. 9, 2003).  As with most issues involved in this litigation, the parties contested virtually every issue of any significance, including both the appropriate method for conducting such discovery and the scope of information that it would include.  *See* DE 222-253.

The parties ultimately agreed that the plaintiffs would provide unredacted affidavits from all potential absent class members attesting to the facts upon which such individuals could claim to be members of the putative class.  *See* DE 226 (minute entry for May 19, 2005 status conference).  Pursuant to that agreement, the plaintiffs made an initial submission of 35 affidavits on June 24, 2005, stating in a cover letter that the submissions, combined with the claims of the six named plaintiffs, sufficed to demonstrate the existence of a sufficient number of class members to sustain a presumption of numerosity.  DE 242.[4]  Following a further dispute as to whether the plaintiffs were required to produce all such affidavits available to them, rather than the number they deemed to be the minimum that would suffice for their purposes, I ruled that the plaintiffs must do the former, and set a deadline of July 27, 2005, for them to comply. DE 243 (minute order dated June 29, 2005).  On the last date for compliance, the plaintiffs

---

[4]  A presumption of numerosity arises upon a showing that a putative class has at least 40 members. *See Consol. Rail Corp. v. Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).  In claiming the minimum number to gain the benefit of that presumption, the plaintiffs wrote in their cover letter that they were submitting 34 affidavits.  In fact, the attachments to that letter included 35 affidavits – although two of them appear to have been submitted by a husband and wife (Joseph Mendolia and Barbara Mendolia) claiming the same damages.  The plaintiffs have only included one of those apparently cumulative affidavits in the materials submitted in support of the instant motion.

submitted an additional 27 affidavits.  *See* DE 247.[5]  In a letter accompanying the latter

submission, the plaintiffs expressed their belief that the affidavits alone were sufficient to satisfy

the numerosity requirement, and that they were therefore entitled to class certification.  *Id.* at 3.  I

declined what appeared to be an invitation in that same letter to decide the issue (on the ground

that such a ruling would exceed my authority, *see* 28 U.S.C. § 636(b)(1)(A)), but noted that the

plaintiffs were free to bring the matter before the assigned district judge.  *See* Order dated July

28, 2005.

As far as I am aware, they chose not to do so at that time.  They filed the instant motion

well over two years later, on February 8, 2008.  DE 333.  As a threshold matter, they argue that

the court is bound by the entirety of *Class Cert. I*, and therefore the only question to be decided is

whether they have satisfied the numerosity requirement of Rule 23(a).  DE 333-2 (Plaintiffs'

Memorandum of Law in Support of Motion for Class Certification) ("Memo.") at 3-4.  In arguing

that they have done so, the plaintiffs rely heavily on the very same affidavits produced in

---

[5]  The plaintiffs intended to submit 28 affidavits but one – that of Tom Sammut – did not include
a signature page.  *Id.*  In addition to the affidavits, the plaintiffs' second submission also included
"a complete list of all Potential Plaintiffs for whom numerosity affidavits could *not* be obtained
in the time allowed."  *Id.* at 1 (emphasis original).  The list contains hundreds of names and is
divided into various categories based on the extent to which the plaintiffs were able to contact the
persons listed and verify that they met the criteria for class membership set forth in *Class Cert. I.*
DE 247-3.  Notably – aside from the 62 potential class members for whom the plaintiffs actually
provided affidavits – the plaintiffs garnered information sufficient to support sending a blank
affidavit for signature to only five individuals whose affidavits they did not actually submit
(although their list is somewhat inaccurate:  it recites that they did not receive executed affidavits
from two persons whose affidavits the plaintiffs did in fact submit (Michael Caraiani and
Gregory Raffa) and it further lists two affiants (Suzanne Dreishpoon and Kevin Flynn) whose
affidavits were never actually submitted until the filing of the instant motion in 2008).  *Id.* at 1-2.
The plaintiffs either failed to contact or were "unable to sufficiently interview" the remaining
persons listed, whose names comprise the bulk of the list.  *Id.* at 3-24.

discovery over three years ago. Memo. Ex. B.[6] Cablevision disagrees that *Class Cert. I* has such

a preclusive effect, and instead argues that the plaintiffs must meet each requirement of Rule 23

anew and that they have failed to do so. DE 334. On February 11, 2008, Judge Irizarry referred

the motion to me for the instant report and recommendation.

II.     Discussion

    A.     Applicable Law

        1.     Class Certification Generally

A plaintiff seeking to bring claims on behalf of an entire class of similarly situated

potential claimants must satisfy two sets or requirements set forth in Federal Rule of Civil

Procedure ("Rule") 23. First, the plaintiff must demonstrate all four of the threshold

"prerequisites" of Rule 23(a): numerosity (meaning that the class is "so numerous that joinder of

all members is impracticable"), commonality (requiring the existence of "questions of law or fact

common to the class"), typicality (requiring the plaintiff's claims to be "typical of the claims ... of

the class"), and adequacy of representation (to ensure that the plaintiff "will fairly and adequately

---

[6] For reasons they have not explained, the plaintiffs have not submitted all of the affidavits
collected in 2005 as evidence of numerosity. Specifically, they have omitted from the exhibits
now before the court the affidavits of Pablo Betancourt, Gregory Raffa, Judy Raitano, Robert
McMahon, Jack Byrnes, Michael Lorento, Robert Dipol, Dominick Vecchiarello, Thomas
Thurston, and Michael Caraiani, all of which were submitted on June 24, 2005. *See* DE 242 (the
plaintiffs also omitted the affidavit of Barbara Mendolia, apparently to avoid making a
duplicative claim). The group of affidavits submitted in support of class certification also
includes two – those of Suzanne Dreishpoon and Kevin Flynn – that the plaintiffs mentioned in
their supplemental submission of July 27, 2005, but did not submit. *See* DE 247-3 at 2. The
unexplained omission of certain affidavits does not affect the analysis below: had those
affidavits been included, I would have found that only three of the affiants (Mr. Betancourt, Ms.
Raitano, and Mr. Thomas) had alleged the kind of cognizable RICO injury that would qualify
them for membership in the putative class. The addition of three class members would have no
effect on my analysis.

protect the interests of the class").  Fed. R. Civ. P. 23(a); *see Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997)).  Second, the plaintiff must show that the claims are among the three "types of class actions" defined in Rule 23(b):  claims that inherently risk prejudice to all class members regardless of whether they participate in the litigation, claims that primarily seek injunctive relief, and claims in which questions of law or fact common to the entire class predominate over individualized questions and in which a class action is the best way to achieve fairness and efficiency.  Fed. R. Civ. P 23(b).

A court considering a motion to certify a class action must conduct a "rigorous analysis" to determine whether each element of Rule 23 has been met.  *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982).  Such analysis cannot rely on mere allegations in a complaint nor even on "some showing" that the plaintiff is entitled to class certification; instead, the plaintiffs must affirmatively establish each requirement of class certification to the court's satisfaction by a preponderance of the evidence.  *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008) ("*Bombardier*"); *In re Initial Public Offering Securities Litig.*, 471 F.3d 24, 42 (2d Cir. 2006) ("*In re IPO*").  As the law of this circuit makes clear,

> (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established ... (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement; and (5) a district judge has ample

discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for a partial trial of the merits.

*Id*. at 41. In making its determination, a court should not decline to "weigh conflicting evidence and determine the existence of a Rule 23 requirement just because that requirement is identical to an issue on the merits." *Id*. at 42.

2.  Law Of The Case

As noted at the outset, this is not the first time the parties have litigated the issue of class certification. That fact has led the parties to debate the applicability of the doctrine known as "law of the case." Both the plaintiffs and Cablevision profess fidelity to the basic idea that the court should not revisit a past ruling in the absence of some intervening development of law or fact that renders reliance on the earlier ruling inadvisable. *See* Memo. at 3 (citing *Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Cooper & Lybrand, L.L.P.*, 322 F.3d 147, 167 (2d Cir. 2003) (where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again) (citing *Zdanok v. Glidden Co.*, 327 F.2d 944, 953 (2d Cir.1964))); Opp. at 14 (citing *Washington Nat'l Life Ins. Co. v. Morgan Stanley & Co.*, 974 F. Supp. 214, 219 (permitting reconsideration of previous ruling based on an intervening change of controlling law, the availability of new evidence, or the need to correct clear error or prevent manifest injustice); DE 336 (plaintiffs' reply memorandum of law) ("Reply") at 2 (citing, *inter alia*, *DiLaura v. Power Auth. of New York*, 982 F.2d 73 (2d Cir. 1992)). Nevertheless, each side ignores that rule where it is expedient to do so. *See, e.g.*, Memo. at 19-20 (arguing that plaintiffs satisfy the requirement of Rule 23(b)(2) without acknowledging

that the court previously ruled against them on that issue in *Class Cert. I*); Opp. at 14-16 (seeking

to argue that the plaintiffs do not satisfy the typicality and commonality requirements of Rule

23(a)(2)-(3) without acknowledging that the court previously ruled in the plaintiffs' favor on that

issue in *Class Cert. I*).

Notwithstanding the parties' disputes, the doctrine is easily described and applied in this

case. It is prudential and discretionary; it is assuredly "not an inviolate rule." *DiLaura*, 982 F.2d

at 76; *see also United States v. Uccio*, 940 F.2d 753, 758 (2d Cir. 1991) (citing *United States v.*

*Birney*, 686 F.2d 102, 107 (2d Cir.1982)). The doctrine essentially treats an earlier ruling as

precedent much like any other decision from a court that is authoritative within the jurisdiction.

The same limitations to the precedential value of a higher court's ruling apply in the context of

the law-of-the-case doctrine. Thus, dicta from a prior ruling is not binding, *see*, *e.g.*, *May Dept.*

*Stores Co. v. Int'l Leasing Corp., Inc.*, 1995 WL 656986, at *1-2 (S.D.N.Y. Nov. 8, 1995) (citing

*DiLaura*, 982 F.2d at 76-77). Likewise, an earlier ruling that is distinguishable on the basis of an

intervening change of facts (based on the discovery of new evidence) or of controlling law is not

binding. *Official Comm. of the Unsecured Creditors of Color Tile*, 322 F.3d at 167 (citing *Virgin*

*Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)).[7] Accordingly, as

---

[7] There are additional limitations on the law of the case doctrine that make an earlier ruling in
the same case less binding than an equally apposite ruling from a higher court. First, while a
district court is not necessarily free to disregard controlling circuit case law to avoid what it
deems to be a manifest injustice, it is free to reverse an earlier ruling in the same case for that
reason. Second, because the doctrine is discretionary, a district court can always reconsider a
prior ruling "if it appears that the ... original ruling was erroneous." *DiLauria*, 982 F.2d at 77
(quoting *Kinsman Transit Co. v. City of Buffalo*, 388 F.2d 821, 825 n.9 (2d Cir. 1968)). Neither
of these limitations affects the analysis below. With respect to the former, there is no disposition
of the instant motion that could reasonably be characterized as a "manifest injustice." Regarding
the latter, while the court's referral of the instant motion unquestionably authorizes me to
consider whether the precedential effect of some or all of the analysis in *Class Cert. I* should be

to any question on which the court's ruling in *Class Cert. I* is not dicta and resolves a matter as to which there has been no intervening change of law or the development of new material facts, I treat that ruling as binding. In all other circumstances, I treat the earlier opinion as apposite and persuasive precedent to the extent warranted by any intervening change of law or new material facts.[8]

### B.    Prerequisites For Class Certification Under Rule 23(a)

#### 1.    Numerosity

To establish numerosity, the plaintiffs need not prove that it would be impossible to join all members of the putative class, only that the "difficulty or inconvenience" of doing so makes a class action an appropriate vehicle for pursuing the litigation. *Central States Southeast and Southwest Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244-45 (2d Cir. 2007); *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993) ("Rule 23(a)(1) requires a finding that the numerosity makes joinder of all class members impracticable. Impracticable does not mean impossible.") (internal quotations and citations omitted). There is no specific minimum number of putative class members that will satisfy the numerosity requirement, and the plaintiffs need not establish the population of the putative class with precision "so long as they reasonably estimate that the number is substantial." *Niemiec v. Ann*

---

limited on the ground that it was mistaken, I nevertheless respectfully decline to engage in such second-guessing of a district judge's decision if it is not necessary. As explained below, I conclude that the court can and should resolve the instant motion without questioning the correctness of any part of *Class Cert. I*.

[8]    The fact that *Class Cert. I* was written by a district judge other than the one to whom the case has since been reassigned is of course entirely irrelevant for purposes of assessing its authoritativeness pursuant to the law-of-the-case doctrine.

*Bendick Realty*, 2007 WL 5157027, at *6 (E.D.N.Y. Apr. 23, 2008) (citing *Robidoux*, 987 F.2d at 935). However, if the plaintiffs can demonstrate that there are at least 40 members of the putative class, the court should presume that numerosity is established. *See Consol. Rail Corp. v. Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).

In assessing whether the plaintiffs have met their burden, the court may draw reasonable inferences and make common sense assumptions. *Niemiec*, 2007 WL 5157027, at *6; *Rocco v. Nam Tai Electronics, Inc.*, 245 F.R.D. 131, 134-35 (S.D.N.Y. 2007). It should not credit any assertions based on "pure speculation" or "bare allegations." *Edge v. C. Tech Collections, Inc.*, 203 F.R.D. 85, 89 (E.D.N.Y. 2001) (citing *Demarco v. Edens*, 390 F.2d 836, 845 (2d Cir. 1968)). Where there is a factual dispute about the size of the putative class, as there is here, the court should make a finding of fact based on the evidence in the record and assess whether the plaintiffs have demonstrated by a preponderance of the evidence that there are enough members of the putative class to satisfy the numerosity requirement under applicable law. *See In re IPO*, 471 F.3d at 41; *Bombardier*, 546 F.3d at 202.

The parties agree that the plaintiffs' burden, in establishing numerosity, is to demonstrate a sufficiently large number of "individuals who can properly plead that they were 'victimized' by the Defendants' 'scheme[.]'" *Class Cert. I* at 6. Where, as here, a plaintiff asserts a civil claim under the RICO Act, 18 U.S.C. § 1961 *et seq*., a showing of such victimization requires the plaintiff to prove that he was "injured in his business or property by reason of a violation of [18 U.S.C.] section 1962[.]" *Id*. § 1964(c); *see, e.g.*, *Anatian v. Coutts Bank (Switzerland) Ltd.*, 193 F.3d 85, 88 (2d Cir. 1999) (defining "injury to business or property as a result of the RICO

violation" as an element of liability in a civil RICO claim); *Tropeano v. City of New York*, 2006 WL 3337514, at *3 (E.D.N.Y. Oct. 31, 2006) (same).

The plaintiffs must thus demonstrate that there exist a sufficient number of people who were injured as a result of the defendants' alleged RICO violation. That in turn requires the plaintiffs to prove that the injury upon which they seek to rely was proximately caused by the defendants' pattern of racketeering activity – which in this case means harms arising from a violation of the mail- or wire-fraud statutes, 18 U.S.C. §§ 1341 & 1343, or from an unlawful extortion in violation of the Hobbs Act, 18 U.S.C. § 1951. *See* Complaint ¶¶ 131-33 (describing the alleged predicate racketeering acts); *Bridge v. Phoenix Bond & Indem. Co.*, 128 S. Ct. 2131, 2141 (2008) (plaintiff seeking to establish injury element must show "that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well") (quoting *Holmes v. SIPC*, 503 U.S. 258, 268 (1992)).

The plaintiffs rely on four types of evidence in attempting to establish numerosity: affidavits from several dozen individuals, each of whom the plaintiffs contend has asserted sufficient facts to establish membership in the putative class; privilege logs pertaining to almost three hundred more individuals who have apparently communicated with the plaintiffs' counsel; a list of hundreds of cases that the defendants have litigated against individuals; and a list of thousands of other names produced by the defendants during discovery proceedings. I review below each source of evidence and the extent to which it establishes numerosity. As explained below, I conclude that all of the evidence in the record suffices to demonstrate the existence of no more than 23 putative class members who are not already named plaintiffs.

16

a.   <u>Affidavits</u>

The plaintiffs rely primarily on the affidavits of 55 separate individuals, each of whom attests to facts that, in the plaintiffs' view, establish membership in the putative class. Memo. Ex. B.[9] If they are correct in that regard – if all 55 (or at least 40) of the affiants are members of the putative class – then the court should presume that numerosity has been established. For the reasons set forth below, however, the plaintiffs' characterization of the affidavits is not correct.

To begin, I provide a summary of the general form of the affidavits. Although the contents vary in a number of ways, and the paragraph numbering does not follow the same sequence in each instance, all (or almost all) of the affidavits make the following allegations, in substance if not *in haec verba*:[10]

1.       I, [name], for the reasons set forth below, believe that I would qualify as a potential absent class member in the above entitled action.

2.       I submit this affidavit based upon my personal knowledge, in connection with a potential motion for class certification.

3.       Defendants accused me of violating a federal law known as the Communications Act.

4(A)    Defendants told me, orally and/or in writing, that I violated the law because I had ordered, purchased, received or possessed what they asserted was an illegal decoding or descrambling device.

*or*

4(B)    [Paragraph omitted; the affiant does *not* allege that the defendants made a representation that mere possession of a decoder was unlawful.]

---

[9] The plaintiffs have submitted 57 separate affidavits, but two of them are duplicates. *See* Memo. Ex. B at 2000056-57, 2000071-72 (duplicate copies of affidavit of Allan Simon); *id*. at 2000102-05 (duplicate copies of affidavit of Fred Gulbrandsen). There are thus only 55 separate affiants. The discrepancy has no effect on my analysis of the instant motion.

[10] The Addendum to this report provides specific information about each affidavit.

5(A).   Defendants accused me, orally and/or in writing, of violating the law because I allegedly intercepted Cablevision's cable television programming service.

*or*

5(B)   [Paragraph omitted; the affiant does *not* allege that the defendants made a representation that the affiant made any unlawful use of a decoder.]

6.      While I may have ordered, purchased, received or possessed what Defendants assert was an illegal decoding or descrambling device, I never used such a device to intercept any of Cablevision's television programming for which I did not pay.  Cablevision's programming was never received or viewed by anyone at my home without its authorization.

7.      Defendants demanded that I pay [amount usually not in excess of $10,000] to "settle" their claims.

8(A)    To defend this action, I have paid [amount] in legal fees to my attorney.

*or*

8(B)    Because I realized that the cost of defending against Defendants' claims would exceed the amount of their "settlement" demand, I paid Defendants [amount].

*or*

8(C)    Because I realized that the cost of defending against Defendants' claims would exceed the amount of their "settlement" demand, I paid Defendants [amount] and I paid my attorney [amount] in connection with this matter.

WHEREFORE, it is respectfully requested that I be considered eligible for class membership, and that I be counted for purposes of establishing numerosity requirement for class certification.

*See* Memo. Ex. B at 2000001-2000136.

Thus, all 55 of the affiants swear that they did not use a decoder device to intercept cable programming and thereby violate the FCA, but that the defendants claimed otherwise.  Moreover 54 of them also swear that they suffered some form of harm – either by paying money to Cablevision in settlement or to the affiant's own attorney in legal fees – after the defendants

claimed that they had violated the FCA.[11]   If such representations were sufficient to demonstrate

membership in the putative class, then I might recommend a finding of numerosity based on a

presumption that the joinder of 54 individual plaintiffs would be impractical.[12]  Such assertions,

however, are merely necessary conditions of class membership – they are not sufficient.

As an initial matter, I note that with only a few exceptions, the affiants are all careful to

avoid saying anything that would support an inference that they actually possessed a decoder

device.  For the most part, they employ a boilerplate formulation undoubtedly crafted by the

plaintiffs' counsel:  "While *I may have* ordered, purchased, received or possessed what

Defendants assert was an illegal decoding or descrambling device, I never used such a device to

intercept any of Cablevision's television programming for which I did not pay." *E.g.*, Memo. Ex.

B at 2000007 (emphasis added).[13]  It is axiomatic that a person who "may have" possessed a

decoder also may not have done so – and the difference is critical to the issue of numerosity.

_____

[11]   Affiant Lev Barkan included no allegation of any kind of payment in his affidavit.  *Id*. at
2000049-50.  Because he has not alleged any injury, the plaintiffs have failed to demonstrate his
membership in the class of persons victimized by the defendants' purported scheme.  I therefore
exclude his affidavit from the analysis below.

[12]   Cablevision contends that the affiants have not sufficiently alleged that they did not use a
decoder to intercept programming and thereby violate the FCA.  *See* Opp. at 8.  I disagree.

[13]   One affiant writes that his decoder device "did not work" and another reports that she was
"never able to use and did not use" her decoder device – supporting an inference that each
actually tried to commit a violation of the FCA but was foiled in the attempt.  Memo. Ex. B at
2000014 (affidavit of William Cohen), 2000021 (affidavit of Robin Bender).  A third affiant
writes that he received a decoder device as a surprise gift from a friend, who ordered the item for
the affiant and then "gave [him] the money to pay for it."  *Id*. at 2000077 (affidavit of Kevin
Flynn).  Other affiants admit purchasing cable converter boxes for non-cable ready televisions or
to improve reception.  *Id*. at 2000002 (affidavit of Robert Forman), 2000110 (affidavit of
Matthew Sturm), 2000029 (affidavit of Raymond Baraniecki).  Still another admits that his
brother "may have" ordered a decoder device "using my pay pal account[.]"  *Id*. at 2000052
(affidavit of Andrew Fitrzgerald).

Any purported plaintiff must demonstrate that his injury was proximately caused by the defendant's alleged RICO violation. *Bridge*, 128 S. Ct. at 2141. A person who *did* possess a decoder device – and who paid thousands of dollars to settle a claim in reliance on Cablevision's false representation that mere possession of the object was a basis for liability – may be able to prove an injury arising from the defendants' violation of the RICO Act. On the other hand, a person who did *not* actually possess a decoder would have had absolutely no reason to respond to such a representation by parting with so much money.[14] Such a person cannot in fairness lay the blame for the loss at the defendants' door, and therefore cannot establish the existence of an injury that was proximately caused by the claimed misconduct.

I cannot fathom why the plaintiffs' counsel, after consistently and adamantly taking the position that mere possession of a decoder is not illegal, would have thought it prudent to avoid having the affiants forthrightly admit lawful ownership of a decoder device. But that is what they have done, and their choice in that regard should preclude a finding that the plaintiffs have established numerosity. For purposes of analysis, however, I am prepared to assume that each of

---

[14] Five affiants make this precise allegation, each swearing that he "never" ordered, purchased, received or possessed a decoder, and yet decided to give the defendants all or most of the amount they demanded on the basis of an accusation that he had used such a device to break the law. *Id.* at 2000045 (affidavit of Maurice Rodrigues, who paid $500); 2000089 (affidavit of Ryan Ceriello, who paid $1,500), 2000095 (affidavit of Joseph Mendolia, who paid $1,500), 2000132 (affidavit of Bernard Stein, who paid $6,000), 2000135 (affidavit of Brian McManus, who paid $2,500). Another affiant writes narrowly that she "*personally* never ordered, purchased, received or possessed" a decider, and that she herself never used such a device unlawfully – without addressing whether anyone else in her household did so and thereby committed a violation of the FCA from which she benefitted; this affiant nevertheless paid $2,500 to settle Cablevision's claim. *Id.* at 2000108 (affidavit of Lena Ertel) (emphasis added). Two affiants swear *both* that they "never ordered, purchased, received or possessed" a decoder *and* that they "may have" done so. *Id.* 2000005 (affidavit of George Briffa), 2000129 (affidavit of Herbert Weiss). Such statements are not irreconcilable – for the precise reason that renders the "may have" formulation used in the bulk of the remaining affidavits an unreliable basis for inferring class membership.

the affiants who has thus far acknowledged no more than that he or she "may have" possessed a decoder did in fact do so, and would be prepared to submit a supplemental affidavit to that effect. Even with that assumption, the majority of the affidavits are insufficient. An individual who can allege non-use of a decoder must still make a further showing to satisfy the requirement that she have a remediable injury caused by the defendants' scheme, and it is in this regard that some of the plaintiffs' affidavits are deficient.

The 54 affiants who allege some form of harm despite denying any use of a decoder to intercept cable programming fall into two categories based on the types of claims that the defendants allegedly made against them. Almost all of the affiants allege that the defendants claimed that they had violated the FCA by *using* a decoder to intercept cable programming. That is the only claim that 31 of the affiants report.[15] The remaining 23 affiants report a second type of claim: specifically, they allege (or imply) that the defendants told them that mere *possession* of a decoder device was itself a sufficient basis for liability under the FCA.[16]

---

[15] The 31 affiants in this category are George Briffa, Alan Lubart, William Cohen, Irv Sevelowitz, Robin Bender, Thomas Farrell, Jonathan Michaels, John Tremark, Michele Ravo, Maurice Rodrigues, Andrew Fitzgerald, Allan Simon, Evangelos Bakalis, Paul Wasik, Kevin Flynn, Kenny Walter, Virginia Donovan, Anthony Loew, Paul Grandinetti, Ryan Ceriello, Jamie Frank, Suzanne Amodio, Joseph Mendolia, Alan Storetveit, Ronald Capobianco, Fred Gulbrandsen, Lena Ertel, Matthew Sturm, Peter Fusco, Nicolas Pierro, and Alfred Loffredo. See Memo. Ex. B at 2000004-05, 2000009-10, 2000013-14, 2000018-21, 2000024-27, 2000031-32, 2000039-40, 2000044-45, 2000051-52, 2000056-57, 2000061-64, 2000076-99, 2000102-03, 2000107-12, 2000116-17, 2000121-22.

[16] The 23 affiants in this category are Robert Forman, Alvin Kaufman, Anthony Lifieri, Michael Varvaro, Raymond Baraniecki, David Lombardo, Donald Carano, Mike Manfredonio, Robert Attanasio, John Justic, Robert Dell-Aquila, Tom Sammut, Mitchell Shapiro, Susan Dreishpoon, Clare Bisulca, William Byer, Todd Fusaro, Joe Zimmerman, Gordon Johnson, Glen Gooding, Herbert Weiss, Bernard Stein, and Brian McManus. *See* Memo. Ex. B at 2000001-03, 2000006-08 2000015-17, 2000022-23, 2000028-30, 2000033-38, 2000041-43, 2000046-48, 2000053-55, 2000058-60, 2000065-70, 2000073-75, 2000100-01, 2000111-15, 2000118-20,

The numerosity issue thus boils down to an analysis of whether there is a sufficient causal connection between the two types of action of which the affiants complain – a threat to sue based on use of a decoder, and a threat to sue based on mere possession of a decoder – and the harm they claim to have suffered. That question in turn requires, as to each type of action, an analysis of the fit between the two types of threatened claims and the two forms of racketeering activity that the plaintiffs allege in their Complaint. Thus, if a threat to sue based on *use* of a decoder followed by the affiant's payment of money can support a claim of RICO-based injury on the theory that the threat constituted either mail- or wire-fraud or extortion, then there are more than 40 affiants who qualify for class membership, and the court must presume that the plaintiffs have established numerosity. If such a threat does not suffice under either a fraud or extortion theory, then the court must consider whether a threat to sue based on mere *possession* of a decoder can support a finding of RICO-based injury; if it does, then there are as many as 23 potential class members in addition to the named plaintiffs, and class certification may still be possible.[17] If neither threat suffices under either theory, then the affidavits do nothing to establish numerosity.

---

2000123-36. All of these affiants also report that they were accused of using a decoder in violation of the FCA, with the exception of affiants Bisulca, Lombardo, and Sammut. *See id.* at 2000034, 2000066, 2000101.

[17] Of the 54 affiants who allege that the defendants made a claim based on unlawful use of a decoder, several appear unable to show class membership for a variety of reasons. *See* n.14 *supra* (listing eight affiants who paid settlement amounts despite never having possessed a decoder); Addendum at A-1 n.2 *infra* (noting that affiant's allegation regarding the defendants' settlement demand is inconsistent with the plaintiffs' theory, *see* Memo. at 2, that the defendants strategically limited their demands to small sums to encourage settlements to which they were not entitled); *id.* at A-2 n.3 *infra* (same). None of these individual circumstances affects my analysis.

i.     <u>Mail Fraud and Wire Fraud</u>

In order to show a sufficient nexus between the defendants' demand and an affiant's injury based on a theory of mail- or wire-fraud, the plaintiffs must demonstrate both that the defendants made a misrepresentation of fact and that the affiant reasonably relied on that misrepresentation in making a payment.[18]

With respect to the reliance element, I note first that the court's analysis in *Class Cert. I* is no longer completely consistent with controlling case law, but that recent developments in the law change only the analysis, and not the conclusion that the plaintiffs must demonstrate each putative class member's reasonable reliance.  In *Class Cert. I*, the court wrote that "to establish a prima facie case of fraud, a Plaintiff must establish that he relied upon a misrepresentation made by the Defendant to his detriment."  *Class Cert. I* at 5.  After the Supreme Court's recent decision in *Bridge*, that formulation is no longer valid.

In *Bridge*, the Supreme Court examined the role of reliance in establishing a civil RICO claim predicated on racketeering acts of mail fraud – an analysis prompted by the plaintiffs' assertion of a claim that they had suffered injury as the result of the fact that certain *non-parties* had relief on the defendants' fraudulent representations.  In that context, the Court explicitly "reject[ed] [the] contention ... that reliance by the plaintiff is an element of a civil RICO claim predicated on a violation of the mail fraud statute."  128 S. Ct. at 2141.  The Court reasoned that

---

[18]  There are of course additional elements, but I conclude that they are sufficiently established for purposes of this motion.  Thus, for example, the plaintiffs have sufficiently demonstrated that the defendants used the mail or wire (telephone) communications in furtherance of the alleged fraud, by submitting affidavits asserting that the defendants made their demands orally or in writing.  Although it is admittedly a logical leap to assume that the defendants transmitted their oral or written communications to the affiants by via telephone or mail, I conclude it is sufficiently likely to warrant making it here.

because "Congress chose to make mail fraud, not common-law fraud, the predicate act for a RICO violation, the 'mere fact that the predicate acts underlying a particular RICO violation happen to be fraud offenses does not mean that reliance, an element of common-law fraud, is also incorporated as an element of a civil RICO claim.'" *Id*. (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 476 (2006)). Thus, as the Court recognized, "a person can be injured 'by reason of' a pattern of mail fraud even if he has not relied on any misrepresentations." *Id*. at 2139.

Notwithstanding that ruling, the court's emphasis in *Class Cert. I* on the need for a showing of reliance remains essentially correct. As the Supreme Court explained in *Bridge*, a plaintiff asserting a civil RICO claim continues to have the obligation to demonstrate both but-for and proximate causation in order to show injury by reason of a RICO violation:

> Of course, none of this is to say that a RICO plaintiff who alleges injury "by reason of" a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentations. In most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation.... In addition, the complete absence of reliance may prevent the plaintiff from establishing proximate cause. Thus, for example, if the county knew petitioners' attestations were false but nonetheless permitted them to participate in the auction, then arguably the county's actions would constitute an intervening cause breaking the chain of causation between petitioners' misrepresentations and respondents' injury.

128 S. Ct. at 2144 (internal citation omitted). Under the circumstances of this case, where the only misrepresentations at issue are those that the defendants made directly to each victim of the alleged scheme, a putative plaintiff cannot establish that his injury was proximately caused by the RICO violation if he cannot allege and prove that he personally relied on the misrepresentations.

Moreover, a putative plaintiff's reliance must have been reasonable. *See Bank of China v. NBM LLC*, 359 F.3d 171, 178 (2d Cir. 2004) ("in order to prevail in a civil RICO action predicated on any type of fraud ... the plaintiff must establish 'reasonable reliance' on the defendants' purported misrepresentations or omissions");[19] *see also Anza*, 547 U.S. at 470 (observing, in an opinion later quoted in *Bridge*, that "courts have historically found proximate causation for injuries ... where the plaintiff's reliance is the immediate cause, such as in an action for fraud, so long as the reliance was reasonably induced by the prior misconduct of the defendant") (internal quotation marks and citation omitted); *State Farm Mut. Auto. Ins. Co. v. Eastern Medical, P.C.*, 2008 WL 3200256, at *5 (E.D.N.Y. Aug. 5, 2008) (noting, in case decided after *Bridge*, that "reasonable reliance ... lies at the heart of plaintiffs' [fraud-based] RICO claims," citing *Bank of China*). The court should therefore assess whether it would be reasonable for a putative class member to incur a monetary injury in reliance on the misrepresentations that the defendants are alleged to have made.

As noted above, the plaintiffs rely on two types of misrepresentations that the defendants allegedly made to class members. First, they assert that the defendants falsely stated (or implied) to each putative class member (with only three exceptions) that there was evidence that the

---

[19] Although decided before *Bridge*, the opinion in *Bank of China* somewhat anticipates the Supreme Court's reasoning. Specifically, the court in *Bank of China* required a showing of "reasonable reliance" on a misrepresentation in the context of a RICO claim predicated on racketeering acts of bank fraud, 18 U.S.C. § 1344, notwithstanding the fact that "[b]ank fraud is a somewhat different type of fraud than common law, securities, mail and wire fraud[.]" 359 F.3d at 177. The court required a showing of "reasonable reliance" not because it is an element of the underlying fraud violation – the kind of rationale later rejected in *Bridge* – but rather because in the context of a RICO claim predicated on any kind of fraud, "reasonable reliance" is essential to the showing of "proximate causation" for a RICO injury that the Supreme Court found to be required in *Holmes v. SIPC*, 503 U.S. 258 (1992). *See* 359 F.3d at 177-78.

individual had used a decoder device to intercept cable programming and thereby violate the FCA. *See* Complaint ¶ 149 ("If Defendants were representing that the Plaintiffs used the decoders to intercept CSC's cable television programming, then the representations were false because Defendants knew they lacked any [such] evidence ...."); Memo. Ex. B (54 affidavits asserting that the defendants made such representations). Second, they contend that the defendants falsely told some of the putative class members that they had violated the FCA simply by possessing a decoder device. *See* Complaint ¶ 148 ("If Defendants were representing that the mere ordering of the decoders violated the Communications Act, then the representations were false because the defendants [knew that not to be true]."); Memo. Ex. B (containing 23 affidavits asserting that the defendants made such representations). For purposes of the instant analysis, I assume that the plaintiffs have established that such representations were made and that they were false.

I conclude that it would be reasonable for an individual to rely on one of the two statements, but not the other. Specifically, a lay individual who had purchased a decoder device, if confronted with an attorney making the representation that mere possession of such an item is unlawful and the basis for civil liability, might reasonably believe that the lawyer was accurately stating the law. It would not be unreasonable for such a person to seek to limit the harm she believed to be inevitable by swiftly negotiating a settlement without incurring the expense of engaging her own counsel. While Cablevision argues to the contrary, and suggests that such affiants had an obligation to verify the truthfulness of the representation, Opp. at 8-9, I disagree. It is only "when a party is aware of circumstances that indicate certain representations may be false ... [that she] must make additional inquiry to determine their accuracy[.]" *Keywell Corp. v.*

*Weinstein*, 33 F.3d 159, 164 (2d Cir. 1994) (citations omitted).  Nothing in the record here indicates that any of the affiants facing a possession-based liability claim was aware of any information that tended to undermine the alleged misrepresentation of law.  Accordingly, the affiants who paid the defendants on the basis of a *possession*-based claim of liability may be eligible for class membership.[20]

In contrast, those affiants who were confronted only with a *use*-based claim of liability cannot show reasonable reliance on a misrepresentation as the proximate cause of their injuries. Those affiants were told something that they unquestionably knew to be factually untrue: namely, that they had used a decoder device to intercept cable programming.  When they made the decision to pay the defendants, it cannot have been because they reasonably believed the defendants' representations about their use of decoder devices – and indeed the affiants do not say it was.  Rather, they assert that they paid money because they "realized that the cost of defending against Defendants' claims would exceed the cost of their settlement demand."[21]   It

---

[20]  It is more difficult to find reasonable reliance on the part of affiants who were confronted with a claim of possession-based liability but incurred expenses after consulting their own attorneys. If it is true that mere possession of a decoder device is not a basis for liability, as the defendants contend, then any lawyer an affiant consulted should have said so – and the failure to do so would constitute an intervening fact that would preclude a finding that the defendants' misrepresentation was a proximate cause of the affiant's injury.  Of the 23 affiants who state that they were told mere possession of a decoder is illegal, nine claim to have paid attorneys' fees. *See* Memo. Ex. B at 2000001, 2000037, 2000047, 2000059, 2000101, 2000115, 2000119, 2000124, 2000127 (affidavits of, respectively, Robert Forman, Donald Carano, Robert Attanasio, Robert Dell-Aquila, Clare Bisulca, Todd Fusaro, Joe Zimmerman, Gordon Johnson, and Glen Gooding).  Excluding these affiants but including the remaining 15 in the putative class, in addition to the named plaintiffs, would not alter my analysis.

[21]  Likewise, those affiants alleging harm in the form of the payment of attorneys fees cannot and do not claim that they made such payments in reliance on the defendants' misrepresentations. Instead, they necessarily made such payments to defend against claims they knew to be untrue.

was this conclusion – that it would be costly to defend against a suit by defendants – that caused their monetary loss, not any reliance (reasonable or otherwise) on the defendants' misrepresentations. Such an attenuated connection between a misrepresentation and the claimed injury cannot suffice to show reasonable reliance. *See McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 223 (2d Cir. 2008) (potential member of class alleging a fraud-based civil RICO claim must "overcome the possibility that a member of the purported class [incurred the claimed injury] for some reason other than the belief that" the defendant's misrepresentation was true).[22]

As a result, no more than 23 of the affiants – those who report being threatened with a possession-based claim of liability under the FCA – can claim a cognizable injury arising from from the defendants' alleged acts of mail- and wire-fraud.[23] To the extent the plaintiffs seek to rely on the affidavits to demonstrate the existence of a larger class, they must therefore establish that other affiants suffered a cognizable RICO injury as a result of the defendants' acts of extortion under the Hobbs Act.

---

[22] It is not impossible for an individual who knew he had never used a decoder to intercept cable programming nevertheless to have suffered a cognizable RICO injury as the result of a use-based claim of liability under the FCA. If the defendants had said (or reasonably implied) that they could succeed in imposing liability on an affiant regardless of any proof that the affiant had never used the decider for an unlawful purpose, then the affiant's settlement payment might be deemed an injury incurred in reasonable reliance on the misrepresentation. But such a statement would essentially be a representation that mere possession of a decoder would support a claim against an affiant – and it is clear that only 23 of the 54 affiants were confronted with such a misrepresentation.

[23] The conclusion that only one of the two types of misrepresentations that the affiants report can sustain a finding of reasonable reliance is fully consistent with prior opinions in this case. In both *Calabrese I* and *Class Cert. I*, the court referred exclusively to a fraud theory based on a misrepresentation that mere possession of a decoder could violate the FCA. *See Calabrese I*, 283 F. Supp. 2d at 808-09; *Class Cert. I* at 5. Neither opinion gave any support for the proposition that the plaintiffs could properly base a mail- or wire-fraud claim on a misrepresentation that an individual had *used* a decoder in violation of the FCA.

## ii.  Extortion

The Hobbs Act forbids interference with commerce through extortion, which the statute defines as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2).  Stated somewhat more plainly, "[e]xtortion, as defined in the Hobbs Act, consists of the use of wrongful means to achieve a wrongful objective." *United States v. Clemente*, 640 F.2d 1069 (2d Cir. 1981); *see United States v. Enmons*, 410 U.S. 396, 399-400 (1973).  An objective can be considered wrongful "where the obtaining of property would itself be 'wrongful' because the alleged extortionist had no lawful claim to that property." *Id*. at 400.  In the context of this case, as the court has previously explained, this means that an affiant suffered an injury arising from an extortion-based RICO violation if he did not use a decoder to intercept cable programming (because unlawful use would mean that the defendants did have a lawful claim against the affiant), and if in addition the affiant was placed in reasonable fear of economic harm as the result of the defendants' wrongful conduct. *Calabrese II*, 2004 WL 3186787 at *6.  Here again, I conclude that no more than 23 affiants – those whom the defendants confronted with a possession-based claim of violating the FCA – can establish a RICO injury; the remaining 31 affiants, who were told only that they had violated the FCA by using a decoder to intercept cable programming, cannot.

All 54 affiants who paid a settlement to the defendants or incurred legal fees to defend against their FCA claims despite the fact that they never used a decoder to intercept cable programming have established – at least for purposes of the instant motion – that Cablevision had no "lawful claim" to their property and that the defendants' objective in recovering money

29

from them was therefore wrongful. *See Calabrese II*, 2004 WL 3186787 at *6 (holding that a potential class member could establish that Cablevision's objective was wrongful by showing that defendants "extort[ed] settlement payments from customers who did not actually use a decoder box"). As a result, the plaintiffs need only show further that the defendants used wrongful means to induce the affiants to part with their money.

As noted above, the statute requires that such wrongful means of inducement must have taken the form of the "use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). The plaintiffs have proffered no evidence of the defendants' actual or threatened use of force or violence against any putative class member, which leaves only the use of fear – "in particular the fear of having to defend a lawsuit and the fear of paying a settlement demand." *Calabrese II*, 2004 WL 3186787 at *6. Such fear of economic harm is sufficient to satisfy the Hobbs Act when the victim "reasonably believed: first, that the defendant had the power to harm the victim, and second, that the defendant would exploit that power to the victim's detriment." *United States v. Capo*, 817 F.2d 947, 951 (2d Cir. 1987), *cited in Calabrese II*, 2004 WL 3186787 at *5.

For reasons already explained, the 23 affiants who confronted a threat of a possession-based claim under the FCA reasonably believed that the defendants had the power to harm them (because they could reasonably rely on the misrepresentation that the FCA imposes liability for mere possession of a decoder), and because the defendants' settlement demand reasonably conveyed an intent to exploit that power if the affiants did not pay something in settlement. Accordingly, as many as 23 affiants have (for purposes of establishing numerosity) shown a

RICO injury arising from the defendants' acts of extortion.[24]  However, because the members of this group of affiants are the same as those whose statements assert a cognizable RICO injury under a theory of mail- and wire-fraud, the fact that they may also have suffered an injury arising from acts of extortion does nothing to help the plaintiffs establish numerosity.

The remaining 31 affiants have not similarly established a RICO injury arising from acts of extortion.  These affiants claim only that the defendants threatened them on the basis of a representation that they knew to be untrue:  that they had used a decoder to intercept cable programming.  As a result, they cannot have had a reasonable belief that the defendants had the power to impose liability on them.  They may, however, have had a belief that the defendants had the ability to harm them simply by bringing a lawsuit, regardless of the merits of the claims in such an action.  This, ultimately, is the crux of the plaintiffs' theory with respect to the remaining 31 affiants:  that the threat of a baseless lawsuit is sufficient to constitute extortion.

The plaintiffs are wrong.  Even if the plaintiffs are correct that the defendants bore no risk by asserting baseless claims under the FCA, and that therefore they could impose litigation costs on the affiants without incurring costs of their own, *see* Memo. at 2 ("the Defendants had neither downside risk nor exposure for their illegal acts"), their legal theory is insufficient because the mere threat – or even the filing – of a meritless lawsuit does not constitute extortion.  *Calabrese II*, 2004 WL 3186787 at *6; *see Building Industry Fund v. Local Union No. 3, Intern. Broth. of Elec. Workers, AFL-CIO*, 992 F. Supp. 162, 176 n.9 (E.D.N.Y. 1996) ("The filing of a meritless

---

[24]  The same caveat with respect to the subset of this group that consulted an attorney applies here:  those nine affiants could not reasonably have believed that the defendants had the legal power to harm them based on mere possession of a decoder.  Here again, however, the matter has no effect on the result I recommend.

lawsuit or administrative action, even if for the purpose of harassment, does not involve a threat of force, violence or fear."); *I.S. Joseph Co. v. J. Lauritzen A/S*, 751 F.2d 265, 267 (8th Cir. 1984) (declining "to expand the federal extortion statute to make it a crime" to threaten or bring a groundless civil action in bad faith).[25]

Moreover, the premise on which the plaintiffs rest their theory – namely, that the defendants had the ability to threaten, and where necessary, actually bring lawsuits that they knew or should have known to be meritless because there was no "downside risk" – is *not* correct. The plaintiffs simply ignore the costs that the defendants would bear if, as the plaintiffs assert, they filed lawsuits in bad faith against the victims of their scheme who did not immediately settle. In such circumstances, the defendants would risk not only the loss of their own litigation costs and attorneys fees in litigating what would presumably be an unsuccessful claim under the FCA; they would also risk being held liable for the victim's attorneys' fees and other litigation costs pursuant to Rule 11(c)(4).

The court need not assume a lay person's familiarity with Rule 11 (which would plainly be an unwarranted assumption) to conclude that it would be unreasonable for an individual confronted with a threat of manifestly baseless litigation to believe that there was no way to escape paying thousands of dollars. The federal judicial system does safeguard against just such extortion, and even if a lay person were cynical enough to believe otherwise and reckless enough

---

[25] To be sure, the plaintiffs' theory is not simply that the defendants threatened baseless litigation, but that they employed "misrepresentations, threats and lawsuits" in order to obtain money from the affiants to which they were not lawfully entitled. *Calabrese II*, 2004 WL 3186787, at *6. But the whole is not greater than the sum of its parts: as explained above, neither the misrepresentations nor the threats, nor the actual lawsuits could reasonably have conveyed to the affiants that the defendants had the power to inflict a cognizable harm.

with his own money to pay thousands of dollars to an extortionist rather than make a minimal effort to find out whether such cynicism was justified, his belief in that regard could not be deemed reasonable. To hold otherwise would risk unduly chilling the ability of plaintiffs to pursue meritorious claims and of their attorneys to assist them in doing so – any lawyer or firm specializing in a particular kind of lawsuit (as well as their clients) would face the prospect of having to defend a RICO class action at least through the discovery and class certification stages of litigation. Moreover, the plaintiffs explicitly acknowledge that at least some putative class members did succeed in resisting the defendants' alleged scheme by seeking sanctions under Rule 11. *See* Memo. at 23 ("[A] victim of Defendants' scheme could retaliate [by] litigat[ing] his or her case and mov[ing] for sanctions under Rule 11 against Defendants. When this did occur, Defendants would drop the suit prior to the Rule 11 motion in order to avoid sanctions.").[26]

In sum, the affidavits that the plaintiffs have proffered in support of their effort to demonstrate numerosity accomplish no more than to establish the existence of a maximum of 23 individuals, other than the named plaintiffs, who are members of the putative class. To the extent the plaintiffs seek to invoke a presumption of numerosity based on a class population of at least 40 members, they must rely on other forms of proof.

---

[26] In explaining this portion of my analysis, I am acutely aware that an assessment of the reasonableness of a person's reaction to the execution of the defendants' purported scheme goes to the heart of the merits of the plaintiffs' RICO theory, and that the court "should not assess any aspect of the merits unrelated to a Rule 23 requirement[.]" *In re IPO*, 471 F.3d at 41. However, in light of the prior decisions in this case defining the putative class and the nature of the affidavits on which the plaintiffs seek to rely, I conclude that this aspect of the merits is inescapably related to a determination of whether the plaintiffs can satisfy the numerosity requirement under Rule 23.

b.     <u>Privilege Logs</u>

The plaintiffs' second source of evidence is an exhibit consisting of 282 separate privilege logs, each of which is attributed to a person designated only by a unique letter identifier, and none of which provides any substantive information. Memo. at 5, 8 & Ex. C. For example, the first item in the exhibit is designated "Individual Z Privilege Log." It reads as follows:

> In the above-captioned action ... the following documents have been withheld by individual Z on the basis of the privileges asserted, and are hereby identified in accordance with the Local Civil Rules of the Eastern District of New York:

| No. | Document | Privilege | Nos. of Pages |
|-----|----------|-----------|---------------|
| 1 | Handwritten/Typed Attorney Notes | Work Product | 3 |
| 2 | Letter, dated 6/15/05, from Binder & Binder, P.C. to Individual | Attorney-Client | 3 |

Memo. Ex. C. at 3000000-01. The exhibit provides no other information about "Individual Z," his or her connection (if any) to the dispute in this case, or the subject matter of the purportedly privileged documents.[27]

In their memorandum of law, the plaintiffs' counsel asserts that the privilege logs relate to "individuals who have contacted this firm in order to become parties to this action," and that those individuals have "stat[ed] that they each could qualify as class members." Memo. at 5, 8. Such an assertion in a memorandum of law cannot serve as a substitute for evidence, and the plaintiffs have submitted no evidence to show that the statement is true. Thus, the privilege logs

---

[27] To the extent that the plaintiffs implicitly assert that the information set forth satisfies the requirements for a privilege log "in accordance with the Local Civil Rules of" this court, they are plainly wrong. *See* Loc. Civ. R. 26.2(a)(2)(A) (listing required disclosures pertaining to a document withheld on the basis of an assertion of privilege).

are just that: lists of items that have been withheld on the basis of a privilege. They are not evidence of anything at all; they certainly do not support the proposition that some or all of the unnamed individuals whose documents the plaintiffs' lawyers have withheld are members of the putative class. *See Edge*, 203 F.R.D. at 89 ("bare allegations" are insufficient to support reasonable estimate that number of class members is substantial).[28]

        c.       The List Of Cases

The plaintiffs next seek to rely on a list, apparently generated by the electronic docketing systems of this court and five other federal courts in the local tri-state area, setting forth the docket numbers, lead party names, filing dates, and closing dates of 1,739 federal lawsuits – but providing no further information about the parties, the issues in dispute, or the outcomes. Memo. at 5, 8 & Ex. D. For example, a typical entry appears as follows:

2:01-cv-1495-JM  CSC Holdings, Inc. v. Ronik  filed 03/03/01  closed 01/29/02

Memo. Ex. D. at 4000001.

The plaintiffs assert in their memoranda of law that the list demonstrates the existence of hundreds of potential class members, because each listed case – according to the relevant court docket – involved a claim by CSC against an individual for theft of services in violation of the

---

[28] The plaintiffs presumably are not in a position to waive the privileges pursuant to which the documents cited in the various logs have been withheld, as those privileges belong to the individual clients asserting them. But that does not mean it is unfair to decline to regard the privilege logs as being something more than they are – namely, evidence of numerosity. Any individual client who wished to reap the benefits of participating in a class action lawsuit, and who believed that she was actually eligible to do, could have done so, either by waiving the privilege or, more simply, by executing the kind of affidavit that the plaintiffs have secured from dozens of other individuals who wished to be included in the putative class. While the fact that the 282 individuals referenced in the privilege logs have declined to do so is not evidence that undermines the plaintiffs' motion for class certification, it would be improper to view that lack of evidence as affirmative proof of the existence of a sufficiently numerous class.

FCA. *See* Memo. at 8; Reply at 8. The plaintiffs then proceed to make the argument that the existence of these lawsuit is evidence of the size of the putative class because

> Defendants' scheme was two-tiered. First, Defendants would send a demand letter threatening suit. In the event that the targeted individual did not make payment; *i.e.*, fought Defendants' allegations, Defendants would proceed to file a lawsuit. Applying the "common sense assumptions" referred to in *Playmobil*, *it is clear that the individuals who would fight Defendants' demands had not violated the [FCA], as they would not have exposed themselves to greater liability*. The history of these cases verifies this assumption: no verdict was reached in these cases against an individual, and each settlement contained no admission that the individual had violated the [FCA]. Therefore, these individuals would also qualify as *potential* members of the putative class.

Memo. at 8 (emphasis added) (quoting *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 239 (E.D.N.Y. 1998)).

The plaintiffs' argument has several fatal flaws. First, of course, is the fact that the "facts" upon which the plaintiffs rely find no support in the record: there is nothing, aside from unsupported assertions by counsel in their memoranda of law, to show that the listed cases involved the claims the plaintiffs describe or produced the results upon which they purport to rely.[29] Second, the argument exposes its own shortcoming: the plaintiffs say no more than that the individual defendants in the listed cases are merely "potential" members of the putative class,

---

[29] Indeed, the plaintiffs' description of the listed cases, in at least several instances, is plainly false. To cite just one of many examples, the plaintiffs include on their list the case of *Bacon v. Cablevision System Long Island Corp., et al.*, No. 03-CV-3205 (TCP) (JO). Memo. Ex. D at 4000062. The caption of the case alone – listing Cablevision as a defendant – reveals that it could not possibly be the kind of lawsuit the plaintiffs describe. The records of this court further reveal that the parties' dispute in that case had nothing to do with the FCA or even with cable programming, but was instead a claim of disability discrimination in violation of the Americans with Disabilities Act. *See id.*, DE 1 (complaint). Nevertheless, after claiming to have searched thousands of docket records, *see* Reply at 8 n.4, the plaintiffs assert that "these cases represent suits initiated by [CSC] against individuals for the wrongful interception of cable services in violation of the [FCA], the very cases giving rise to this litigation." Reply at 8. They go on to chide the defendants for not having "searched these docket sheets" themselves. *Id.*

rather than persons whose eligibility for membership has been established.  Third, the suggestion

that "the individuals who would fight Defendants' demands" – meaning only that they did not

immediately accede to the defendants' demand and thereafter found themselves named as lawsuit

defendants – "had not violated the [FCA], as they would not have exposed themselves to greater

liability[,]" is truly preposterous.  It reduces to a presumption that anyone CSC decided to sue

cannot possibly have used a decoder to violate the FCA, as well as the equally perverse

assumption that those who settle to forestall a lawsuit must likewise be innocent.  Such reasoning

is as foreign to our system of justice as it is illogical.[30]  I therefore conclude that the plaintiffs' list

of cases does nothing to support a finding of numerosity.

<blockquote>d.    The List Of Names</blockquote>

Finally, the plaintiffs rely on a chart entitled "Status Data Names Query" that has

thousands of entries, each with fields for first name, last name, city, state, and ZIP code (although

not every entry provides information in all five fields); the list provides no information about the

persons listed or their relationship, if any, to the issues in the instant lawsuit.  Memo. at 5 & Ex.

E.  For example, the first line provides the following information:

Ed      [no last name]       Dix Hills       NY     11746

Memo. Ex. E at 5000000.

---

[30]  The plaintiffs' blanket assertion is also, not surprisingly, demonstrably false.  For example, the
plaintiffs cite the case of *CSC Holdings, Inc. v. Kelly*, 03-CV-2337 (ADS), as a case involving an
individual who "f[ou]ght Defendants' demands" by refusing to settle, was sued, and should
therefore be presumed to be a putative class member on the ground that he did not violate the
FCA.  Memo. Ex. D at 4000062; Memo. at 8.  In fact, the court in that case found that the
defendant *did* violate the FCA and entered judgment accordingly.  *See CSC Holdings, Inc. v.
Kelly*, 374 F. Supp. 2d 303, 305 (E.D.N.Y. 2005) ("it is reasonable to conclude that the
Defendant bought the [decoder] device to steal premium services from the Plaintiff").

This last proffer is the weakest of all.  The plaintiffs characterize the list as having been derived from documents that the defendants produced in discovery pursuant to an order that required disclosure of information from which the defendants culled the names of persons they believed had improperly intercepted programming.  *See* DE 243 (minute order dated June 29, 2005, directing CSC to produce documents); DE 238 (letter from CSC's counsel providing description of the documents I later ordered disclosed); Memo. at 5.  That characterization reveals the flaw in the plaintiffs' argument:  the list of names is not, and was not intended to be, a list of putative class members.[31]  There is nothing in the list, or anywhere else in the record, to suggest that all of the listed individuals possessed a decoder, used such a device in violation of the FCA (or, more to the point, refrained from doing so), relied on any misrepresentation by the defendants, or sustained any injury.  To draw any inference from the list would be an exercise in "pure speculation."  *See Edge*, 203 F.R.D. at 89.

e.   Conclusion As To Numerosity

As explained above, I conclude that the plaintiffs have thus far established the existence of no more than 23 members of the putative class in addition to those who are already named parties.  They are therefore not entitled to a presumption that they have satisfied the numerosity

---

[31]  The plaintiffs contend that the only alternative to a finding that the list derived from such discovery is comprised exclusively of class members is a finding that the defendants necessarily committed contempt of court by providing non-responsive information in response to my order. *See* Reply at 9.  Given the nature of the order I actually issued, which the plaintiffs expediently fail to cite, the argument is almost too specious to warrant a response.  Nevertheless, to be clear, I note that the order to which the plaintiffs refer decided nothing more than that the category of records the plaintiffs sought from the defendants was reasonably likely to lead to the discovery of admissible evidence.  Nothing about my ruling supports the proposition that any person whose identity was disclosed pursuant to that order was necessarily a member of the putative class as defined in *Class Cert. I.*

requirement.  But that fact does not necessarily end the court's inquiry; instead, it raises two additional questions.  First, have the plaintiffs demonstrated that the size of the putative class makes "joinder of all members ... impractical" within the meaning of Rule 23(a)(1)?  Second, if the answer to the preceding question is "no," should the motion to certify a class be denied with prejudice, or should the defendants instead be given a further opportunity to meet the requirements for class certification?  For the reasons discussed below, I recommend that the court answer each of those questions adversely to the plaintiffs.

First, the membership of the putative class is at the low end of the range that courts have found amenable to class certification.  *See* 5 James Wm. Moore et al., *Moore's Federal Practice* § 23.22[1][b] (3d ed. 2008) (courts have found that fewer than 21 is generally inadequate and numbers between 21 and 40 are given varying treatment).  In assessing whether the plaintiffs have met their burden of demonstrating that it would be impractical to join all class members in a single action, the court should consider such factors as "judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members."  *Robidoux*, 987 F.2d at 936 (citing 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 3.05 at 143 (2d ed. 1985)).  The plaintiffs have not met this burden – indeed, they have said virtually nothing on this score, relying instead on an assertion that they have established a class that is presumptively large enough to establish numerosity.  *See* Reply at 9-10.  Their evidence demonstrates that the potential class members are not geographically dispersed:  almost all of affidavits were executed

within commuting distance of this district's Brooklyn courthouse.[32]  Further, there is no

information about the affiants who might qualify as class members to suggest that they would be

unable to pursue individual relief.  Finally, to the extent that – as discussed below – the trial of a

certified class action would require mini-trials as to each affiant's claim, it cannot be the case that

joinder of all plaintiffs in a single non-class action would be any more impractical than the

litigation the plaintiffs propose.  I therefore conclude that the plaintiffs have not established

numerosity, and respectfully recommend that the court deny the motion on that basis.

Second, the plaintiffs have had years to develop their proof as to numerosity.  It is evident

that they have done as well as they are ever likely to do:  the best – albeit insufficient – proof of

class membership is comprised of the 55 affidavits that the plaintiffs had secured over two years

before they renewed their motion for class certification.[33]  The fact that the plaintiffs were unable

to secure any further evidence since compiling the affidavits of potential class members – and in

particular the fact that they did *not* secure similar affidavits from the hundreds of other persons

with whom their attorneys have spoken and as to whom they have submitted privilege logs –

strongly suggests that they will never be in a better position to establish numerosity.  Indeed, the

record is clear that the plaintiffs had an obligation to disclose their best evidence in this regard as

part of the discovery process.  *See* DE 243 (minute order dated June 29, 2005) ("plaintiffs must

provide unredacted affidavits from 'all' potential absent class members, not simply the minimum

---

[32]  Indeed, only one of the 23 affiants who qualify as members of the putative class executed his affidavit outside of the local tri-state area.  *See* Memo. Ex. B at 2000006-08 (affidavit of Alvin Kaufman, executed in Las Vegas, Nevada).

[33]  The last of the qualifying affidavits was executed on July 18, 2005.  Memo. Ex. B at 2000070. The plaintiffs first attempted to file the instant motion on January 4, 2008.  *See* DE 331.

number needed to satisfy the numerosity requirement for maintaining a class action.").[34] The evidence developed to date serves only to bolster the court's earlier observation that "it is unique for a pirate cable box to be used for purposes other than illegally intercepting cable." DE 148 (Memorandum and Order dated Aug.17, 2004) at 13. The phenomenon appears to be so rare that it seems unlikely the plaintiffs will ever be in a position to establish the existence of a class so numerous as to make the joinder of individual claims impractical. I therefore further respectfully recommend that the court deny the motion for class certification with prejudice.

### 2. Commonality And Typicality

In addition to numerosity, the plaintiffs must demonstrate that their claims raise "questions of law or fact common to the [putative] class" and "are typical of the claims ... of the class[.]" Fed. R. Civ. P. 23(a)(2), (3). In *Class Cert. I*, the court found that the plaintiffs had made those required showings. *Class Cert. I* at 7-9.

Cablevision nevertheless now asks the court to revisit that finding, arguing that it is not entitled to deference as law of the case both because the finding was dicta when made and because it has been shown to be mistaken by later events. *See* Opp. at 14-16. Even if Cablevision is correct that the finding was dicta, it is incorrect about the significance of later events, and I conclude that the court should adhere to its earlier finding about commonality and typicality.

---

[34] It is of course conceivable that depositions of the defendants would have led to the discovery of further evidence that would suffice to establish numerosity. If that is true, then the fact that the plaintiffs have not sought such discovery, despite years of opportunity to do so, undermines to the point of unreliability the court's assumption in *Class Cert. I* that the plaintiffs are adequate class representatives and that their attorneys are capable of litigating the case on behalf of the putative class.

First, regardless of whether the finding was necessary to the court's earlier ruling, the court was correct in observing that the question of the existence of the RICO enterprise alleged in the Complaint was a question of fact common to all members of the class claiming injuries arising from the alleged violation of the RICO Act. *Class Cert. I* at 7. That observation remains as true today as when it was made.

Second, even if it is true that *some* of the named plaintiffs have claims that are rendered atypical because of the availability of defenses unique to those plaintiffs, as Cablevision argued in opposing class certification and again now, *see Class Cert. I* at 8-9; Opp. at 15-16, it is also true that there are at least two named plaintiffs whose claims are unquestionably typical of the class they seek to represent. Cablevision argues that the claims of named plaintiffs Mel Gevanter and Ralph Reel are subject to unique defenses because each of them previously entered into a settlement with Cablevision that released the latter from liability on the claims in the instant case. *See* Opp. at 16. Cablevision similarly argues that the claims of plaintiffs Gevanter and Cira Calabrese are atypical for other reasons, Opp. at 15, and notes that the claims of named plaintiffs Anthony Fiore and Stewart Kalter have already been dismissed for lack of prosecution. *See* Opp. at 2; *see also* DE 154 (order dated Aug. 25, 2004, dismissing Stewart Kalter's claims) at 2; DE 319 (order dated Feb. 8, 2007, dismissing Anthony Fiore's claims). Even if its position is correct as to all of those named plaintiffs,[35] it is largely irrelevant. If plaintiffs Calabrese, Gevanter and

---

[35] While a motion to dismiss the claims of plaintiffs Gevanter and Reel on the basis of their settlement agreements is not now before the court, there is no reason to assume with any certainty that Cablevision would succeed in securing such relief. The plaintiffs' theory is, in part, that they and their fellow class members entered into settlements with Cablevision as the result of a fraud. If they are correct in that regard, then the settlement agreements procured by such fraud might be void *ab initio* and therefore unenforceable. *See Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1541 (2d Cir. 1997) (citing *Stephens v. Am. Home Assurance Co.*, 811 F. Supp.

Reel were all dismissed as plaintiffs (as plaintiffs Fiore and Kalter have been already), named plaintiffs Sylvia Howell-Fridie and Steven Schiff would remain parties to this case, and their claims would continue to be typical of the class they seek to represent.

"The typicality requirement is satisfied if the representative plaintiff's claims are based on the same legal theory and arise from the same practice or course of conduct as the other class members." *Playmobil*, 35 F. Supp. 2d at 241 (quoted in *Class Cert. I* at 7). Regardless of the status of the claims asserted by other plaintiffs, the claims of plaintiffs Howell-Fridie and Schiff plainly meet that standard. Cablevision makes no attempt to explain why the court's finding of typicality – at least as to those two plaintiffs – either was incorrect when originally made in *Class Cert. I* or has become so in the intervening years. I therefore respectfully recommend that the court find that at least those two named plaintiffs have established commonality and typicality.

### 3. Adequacy Of Representation

The final prerequisite for maintaining one of the three permissible types of class actions is that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The parties agree that the latter requirement has two components: a finding that the named plaintiffs themselves are adequate class representative because they have no interests adverse to the class as a whole, and a separate finding that the attorneys who represent them are competent to vindicate class interests. *See* Memo. at 14; Opp. at 16-17; *see also Class Cert. I* at 9-10. The court previously found that the plaintiffs had demonstrated both prongs of the adequacy requirement. *Class Cert. I* at 10-11.

---

937, 946-47 (S.D.N.Y. 1993), *vacated and remanded on other grounds sub nom. Stephens v. National Distillers and Chem. Corp.*, 70 F.3d 10 (2d Cir. 1995)); *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 32-33 (2d Cir. 1997).

Cablevision now contests both components of that ruling. Its argument as to the adequacy of the plaintiffs themselves is essentially the same argument discussed above with respect to typicality and commonality – namely, that the weaknesses of the claims of some of the named plaintiffs renders them inadequate. Leaving aside the fact that Cablevision has already litigated and lost this issue, and has shown no good reason to be given an opportunity to do so again, I reject the argument regarding the plaintiffs for the same reason explained above: even if several of the named plaintiffs cannot function as adequate class representatives, it remains true that at least two of them can.

Cablevision's argument as to the adequacy of counsel is more compelling. As noted above, the law-of-the-case doctrine renders the court's decision in *Class Cert. I* authoritative only to the extent that the legal rules and factual assumptions upon which it relied remain valid. To the extent that the court found the plaintiffs' counsel adequate in *Class Cert. I*, it relied on the fact that counsel "ha[d] previously handled cases defending Cablevision subscribers from lawsuits initiated by CSC" and concluded that "*absent any showing that the firm lacks in professionalism or competence*, the ... firm [is] adequate counsel to pursue this case." *Class Cert. I* at 11 (emphasis added).

Cablevision argues persuasively that the experience of the last several years has provided the showing that the court found lacking in 2003. It rehearses a series of lapses by the plaintiffs' counsel, which I will not repeat here, that Cablevision argues should preclude a finding of adequacy. Opp. at 18 & n.13. While I share a concern that the firm now representing the plaintiffs may not be in a position to provide the best representation for the putative class, I nevertheless respectfully recommend that the court refrain from deciding the issue. If the court

accepts my recommendation to deny certification based on a failure to show numerosity and on a failure to satisfy any of the provisions of Rule 23(b), the issue of counsel's adequacy will be moot.  On the other hand, if the court rejects my recommendations and finds all of the other requirements of Rule 23 satisfied, it would have the authority under Rule 23(g) to allow the plaintiffs to make a showing of their counsel's adequacy or, failing that, to give them an opportunity to find an adequate replacement.  Accordingly, I respectfully recommend that the court find the plaintiffs to be adequate representatives and that it defer ruling on the adequacy of their counsel.

      C.      <u>Requirements For Class Actions Under Rule 23(b)</u>

In addition to satisfying all of the prerequisites set forth in Rule 23(a), the plaintiffs must also demonstrate that the circumstances of this case satisfy at least one of the conditions described in Rule 23(b); namely a risk of inconsistent or effectively binding adjudications among members of the putative class, the propriety of class-wide injunctive relief, or a predominance of class-wide issues over individual ones that renders collective adjudication the best way to achieve a fair and efficient adjudication of the controversy.  For the reasons explained below, I conclude that the plaintiffs can satisfy none of these conditions – and that as a result, they are not entitled to have the court certify a class even if they have succeeded in establishing numerosity and all of the other prerequisites under Rule 23(a).

      1.      <u>Rule 23(b)(1):  Risks To Putative Class Members</u>

When they first sought class certification, the plaintiffs conceded that this case could not be maintained as a class action under Rule 23(b)(1).  *See Class Cert. I* at 12.  Nevertheless, the plaintiffs now make a half-hearted attempt to argue that their claim constitutes the type of class

action that guards against the risk of "inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A); *see* Memo. at 18-19.[36]  I conclude that the plaintiffs were right to have abandoned the theory the first time they litigated the matter.

To be sure, courts have not yet developed precise guidelines for certifying class actions under Rule 23(b)(1)(A). *See In re Simon II Litigation*, 407 F.3d 125, 133 n.6 (2d Cir. 2005) (citing 2 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 4:4 (4th ed. 2005)). Nevertheless, the Supreme Court has provided some guidance:  the provision "takes in cases where the party is obliged by law to treat the members of the class alike (a utility acting toward customers; a government imposing a tax), or where the party must treat all alike as a matter of practical necessity (a riparian owner using water as against downriver owners)." *Amchem Prods., Inc.*, 521 U.S. at 614 (citation omitted); *Richards v. FleetBoston Financial Corp.*, 238 F.R.D. 345, 353 (D. Conn. 2006) ("courts generally apply Rule 23(b)(1)(A) restrictively, to classes where there is a statutory obligation to treat all class members alike").

The plaintiffs' sole argument in support of certification under subsection (b)(1)(A) is that this is a case in which a party is under a legal or practical obligation to treat all class members the same.  They analogize Cablevision to a utility, note that it is "subject to governance by the New York Department of Public Services," and argue that as a matter of practical necessity it must treat its customers alike.  Memo. at 18-19.  But they do not, and cannot, claim that Cablevision is

---

[36]  The plaintiffs do not argue that the class can be maintained under the related provision that authorizes the certification of class actions to guard against the risk of "adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests[.]"  Fed. R. Civ. P. 23(b)(1)(B).

under any obligation, legal or otherwise, to treat all members of the putative class alike with respect to the actions at issue here. The methods by which Cablevision seeks to combat what it believes to be theft of its cable services must all be lawful, but there is neither a legal obligation nor a practical one that those methods must be uniform. I therefore respectfully recommend that the court deny certification of a class action under Rule 23(b)(1)(A).

2.  Rule 23(b)(2):  Injunctive Relief

The court may certify a class action if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]"  Fed. R. Civ. P. 23(b)(2). While the fact that the plaintiffs seek some form of monetary relief does not inherently preclude the certification of a class under this provision, the Advisory Committee on Civil Rules has "cautioned ... that '[it] does not extend to cases in which the appropriate final relief relates exclusively or *predominantly* to money damages.'"  *Parker v. Time Warner Entertainment Co.*, 331 F.3d 13, 23 (2d Cir. 2003) (quoting Fed. R. Civ. P. 23(b)(2) advisory committee's note (1966)) (emphasis added in *Parker*); *see also Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 162-63 (2d Cir. 2001).  When the plaintiffs first sought class certification in 2003, the court found that they were "primarily seeking money damages" and therefore ruled that the case could not be certified under subsection (b)(2).  *Class Cert. I* at 14.  In seeking to relitigate the matter, the plaintiffs do not even acknowledge that ruling, let alone explain why it should not be accorded deference as the law of this case.  Nor do they argue that there has been any change of law or fact, or of the nature of the relief they seek, in the years since they first failed to persuade

the court on this issue. *See* Memo. at 19-20. For that reason alone, the court can and should reject their attempt to secure certification of an injunctive class action.

I would in any event recommend the same result even if the plaintiffs were now making their argument for the first time. Where, as here, putative class plaintiffs seek both monetary damages and injunctive relief, the court must consider all of the circumstances and determine which goal predominates. It must make an "informed" finding on two matters: first, whether "the positive weight or value [to the plaintiffs] of the injunctive or declaratory relief sought is predominant even though compensatory or punitive damages are also claimed," and second, whether "class treatment would be efficient and manageable, thereby achieving an appreciable measure of judicial economy." *Robinson*, 267 F.3d at 164 (internal quotation marks and citations omitted). Moreover, the plaintiffs must establish to the court's satisfaction that a reasonable plaintiff would bring the suit to obtain the injunctive or declaratory relief "even in the absence of a possible monetary recovery" and also that "the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits." *Id.*

No such finding appears to be appropriate here. First, of the several remedies that the plaintiffs seek in their Complaint, eight are in the form of monetary damages, two are in the form of declaratory relief, another two are hybrid requests, and only one is solely in the form of injunctive relief. Complaint ¶ 169. To the extent that the plaintiffs seek to evade the import of that fact by characterizing the monetary relief they seek as restitution – and therefore equitable in nature, *see* Memo. at 19 – their argument is unpersuasive. Each of the first two remedies they seek is an award of $3,000,000 in damages, which they then seek to treble pursuant to section 1964(c) of RICO. *Id.* ¶ 169(A)-(B). A request for treble damages cannot in any way be

considered an attempt to secure equitable relief.  *See Genty v. Resolution Trust Corp.*, 937 F.2d 899, 912 (3d Cir. 1991) ("Congress obviously had much more in mind than merely providing compensation for individual RICO victims when it authorized RICO civil actions....  Congress' overall purpose in passing RICO, to redress serious harm to the nation as a whole, is evidence of the punitive character of the treble damages provision.").  Indeed, there are several cases in which "the mere request for treble damages ... was held to place the action outside the parameters of class certification under Rule 23(b)(2)." *See Daniel v. Am. Bd. of Emergency Medicine*, 269 F. Supp. 2d 159, 205 n.19 (W.D.N.Y. 2003) (citing cases).

Further, the plaintiffs themselves undermine the proposition that a reasonable plaintiff in their position would seek to maintain this lawsuit even if monetary damages were unavailable: as they explicitly argue (in support of their request to certify a different type of class action), "'too little is at stake in a single claim'" to justify an individual lawsuit seeking declaratory relief. Memo. at 23 (quoting Complaint ¶ 16).  Moreover, I agree with Cablevision, *see* Opp. at 20 n.15, that those individuals who have already entered into settlement agreements – four of the seven named plaintiffs, *see* Complaint ¶¶ 77, 87, 107, 122, and almost all of the affiants, *see* Memo. Ex. B – have virtually nothing to gain for themselves by securing declaratory or injunctive relief and would therefore have little if any incentive to prosecute the claims in this case absent the possibility of monetary recovery. I therefore respectfully recommend that the court decline to certify a class action of the type specified in Rule 23(b)(2).

3.  Rule 23(b)(3):  Predominance and Superiority

The third type of class action available under Rule 23, and the one that comes closest to being appropriate under the facts of this case, is one in which questions of law or fact that are

common to the putative class "predominate over any questions affecting only individual members" and in which the proposed certification "is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In *Class Cert. I*, the court found that the plaintiffs had satisfied both the "predominance" and "superiority" prongs of that provision. *Class Cert. I* at 14-17. Nevertheless, I conclude that in light of more recent controlling case law, the court should now revisit its earlier determination. Specifically, as discussed below, the decision in *McLaughlin* undercuts an essential part of the court's earlier decision as to predominance, and the intervening opinions in *In re IPO* and *Bombardier* require reconsideration as to superiority.

a.  <u>Predominance</u>

In reaching its earlier conclusion that the plaintiffs had established predominance, the court explicitly acknowledged that "there are a number of individual issues of fact, resolution of which is essential to the final adjudication of this case." *Class Cert. I* at 15. The court further "recognize[d] that these individual issues may require separate 'mini-trials' and may substantially slow the adjudication of this case." *Id*. at 16. Nevertheless the court concluded that "the common issues of fact and law, regarding the existence of a 'RICO enterprise,' the misleading nature of the Defendants' communications, the Defendants' allegedly fraudulent intent in this case and the existence of a conspiracy among the Defendants, predominate this action." *Id*. In doing so, the court relied on the following legal standard:

> "The predominance requirement is satisfied unless it is clear that individual issues will overwhelm the common questions to render the class action valueless." [*Playmobil*, 35 F. Supp. 2d] at 245; *see also Milberg v. Lawrence Cedarhurst Fed. Sav. & Loan Ass'n*, 68 F.R.D. 49, 52 (E.D.N.Y. 1975) ("The requirement that issues of law and fact predominate does not demand that only common issues be

presented for class action treatment.  The critical question is whether the individual issue will overwhelm and render the class action form valueless.").

*Id*. at 14-15.

If there had been no change of fact or law since the court reached its conclusion, I would recommend adhering to it, regardless of whether I would recommend making the same decision in the first instance.  However, in light of intervening developments of both fact and law, the court must reconsider the matter.[37]

First, even under the legal standard the court applied in 2003, the evidence that has since become available – indeed, the very evidence on which the plaintiffs purport to rely in renewing their motion for class certification – makes it "clear that individual issues will overwhelm the common questions to render the class action valueless." *Playmobil*, 35 F. Supp. 2d at 245. When the court included "the misleading nature of the Defendants' communications" among the common questions of fact that it found to predominate, *Class Cert. I* at 16, it did not have before it the 55 affidavits purporting to establish the membership of dozens of individual in the putative class.  Those affidavits demonstrate that the nature of the defendants' communications, misleading or otherwise, will be a matter of individualized proof:  many of the affiants attest to receiving oral communications, and not of a uniform nature.  Indeed, the affiants attribute at least two different types of representations to the defendants – a claim that mere possession of a decoder constituted a violation of the FCA (which would likely be a misrepresentation of law), and a claim that the affiant had violated the FCA by using a decoder to intercept cable programming (which may have been a misrepresentation of fact, but which was an accurate

---

[37]  Because I reach this conclusion, I do not consider the defendants' argument that the court's earlier analysis of the predominance element was dicta.

statement of law if based on a valid factual premise).  While it may be true that there were only two different types of representations made to various victims of the alleged scheme, and that those statements were always made in the same way, it would be completely speculative to make such an assumption; the record shows only that dozens of individuals received oral communications, and that those communications were far from uniform.[38]

Second, and of far greater significance to the continuing validity of the earlier finding of predominance, the law of this circuit has recently clarified the interplay of the predominance requirement and the role of reliance in a RICO class action based on allegations of fraud.  Under that new case law it is clear that individualized questions of reliance – even on an alleged misrepresentation that was made in the same way to all class members – preclude a finding of predominance.

In *McLaughlin*, decided in 2008, a group of cigarette smokers sought to maintain a class action against various tobacco companies that had marketed so-called "light cigarettes" (or simply "Lights").  The plaintiffs asserted a RICO claim predicated on racketeering acts of mail- and wire-fraud, on the theory that the marketing campaign, which they claimed had misrepresented Lights as a healthier alternative to smoking regular cigarettes, caused the plaintiffs "to buy Lights in greater quantity than they otherwise would have and at an artificially high price, resulting in plaintiffs' overpayment for cigarettes."  522 F.3d at 220.  After the district court certified that the class could properly be maintain pursuant to Rule 23(b)(3), the Court of

---

[38]  If it is correct, as the plaintiffs assert, that the defendants' monetary demands to victims of the alleged scheme reflected "a very carefully calculated settlement 'breakpoint' that would strongly encourage the individuals to pay[,]" Memo. at 2, then the fact that those demands ranged so widely from case to case (from a low of $500 to a high of $60,000, *see* Memo. Ex. B at 2000005, 2000045) suggests that even the defendants' intent may be subject to individualized proof.

Appeals reversed on the ground that the plaintiffs had not established that "the issues of injury and causation do not defeat the predominance requirement[.]"  *Id.* at 222.

The appellate court began its analysis with the premise that a plaintiff asserting a civil RICO claim predicated on racketeering acts of mail- or wire-fraud must prove the existence of an injury caused by reliance on the defendant's misrepresentation.  *Id.*[39]  It then noted that the plaintiffs' predominance argument was that the defendants' alleged fraud "resulted from a common course of conduct," and that "'fraud claims based on uniform misrepresentations made to all members of the class ... are appropriate subjects for class certification because the standardized misrepresentations may be established by generalized proof.'"  *Id.* at 223 (quoting *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002)).[40]

That is essentially the same argument that the plaintiffs make here, and the same rationale that the court appears to have adopted in previously finding that the plaintiffs had established predominance.  *See Class Cert. I* at 15 (citing *Moore*).  However, the court in *McLaughlin* explicitly rejected such reasoning:

---

[39] *McLaughlin* was decided shortly after *Bridge*, but did not discuss the latter opinion.  As explained above in Section II.B.1.a.i of this discussion, where the plaintiff's theory is limited to first-party reliance on the alleged misrepresentation – as is the case here and as was also true in *McLaughlin* – he must still show such reliance in order to demonstrate the element of RICO injury, even if it is not required to demonstrate the underlying fraud itself.  Moreover, as explained above in Section II.B.1.a.ii, the same reasoning pertains to the plaintiffs' extortion theory.

[40] In both *McLaughlin* and the circumstances presented to the court in *Class Cert. I*, the assumption of uniform misrepresentations made to all members of the putative class was reasonable.  As explained above, however, the evidence that the plaintiffs have now submitted in support of their claim of numerosity demonstrates that the court can no longer assume that the defendants' misrepresentations will be the source of generalized proof.

But proof of misrepresentation – even widespread and uniform misrepresentation – only satisfies half of the equation; the other half, reliance on the misrepresentation, cannot be the subject of general proof. Individualized proof is needed to overcome the possibility that a member of the purported class purchased Lights for some reason other than the belief that Lights were a healthier alternative[.]

522 F.3d at 223.

The court thus recognized that even if a class can prove an allegedly fraudulent misrepresentation through generalized proof, in most cases it cannot establish predominance unless it can also demonstrate the necessary element of reliance without resort to individualized proof. *Id.* Although the court stopped short of holding that a class can never be certified where individual reliance will be an issue – as is the rule in at least one other circuit, *see Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 (5th Cir.1996) – it found that in the case at bar "reliance [wa]s too individualized to admit of common proof." 522 F.3d at 225.[41]

There can be no doubt that the proof of reliance in this case, as in *McLaughlin*, will vary significantly from one class member to the next. Even within the subset of affiants who are members of the putative class – those who were told that mere possession of a decoder violated the FCA – there are plainly important differences in terms of the reasonableness of each affiant's claimed reliance on the misrepresentation. Some of those affiants consulted counsel

---

[41] The court also found that individual questions would predominate on the issue of injury in part because "individual smokers would have incurred different losses depending on what they would have opted to do, but for the defendants' misrepresentation." *Id.* at 228. Here, while I presume for the sake of argument that none of the members of the putative class would have paid some amount of money in settlement or legal fees but for the defendants' statements, the proof will necessarily be individualized as to why each putative class member decided to settle (if at all) for a particular sum, and the reasonableness of each member's decision in that regard. The need for individualized proof is only heightened in the cases of putative class members who consulted attorneys before settling claims that any competent attorney would have recognized as baseless and subject to Rule 11 sanctions if filed.

(notwithstanding the plaintiffs' theory that the defendants' scheme was designed to deter such consultation),[42] others simply decided to settle a legal claim without seeking legal advice.  Of those that consulted attorneys, only some claim damages for amounts paid to Cablevision in addition to their attorneys' fees, indicating that they decided to pay the settlement after receiving legal advice.[43]  Because "each plaintiff must prove that ... his or her reliance on [the alleged] misrepresentation was the proximate cause of his or her loss[,]" *Moore*, 306 F.3d at 1253, each of the affiants in this group would have to demonstrate that the decision to pay Cablevision arose from reliance on the original representation rather than on his or her own counsel's advice. Moreover, it appears that some of the putative class members were told *only* that mere possession of a decoder was unlawful, while others were told that they had violated the FCA by possessing a decoder *and* by using it to intercept cable programming.[44]  Those who heard only a false (but plausible) misrepresentation of law may have had better reason to rely on it than those who heard the same misrepresentation made in conjunction with the presumably false assertion that the affiant had used a decoder.

In light of the fact that RICO injury is an element of liability for a civil RICO claim, and in light of the fact that proof of reliance is necessary to prove that element where the civil RICO claim is predicated on allegations of mail- and wire-fraud and extortion, it is clear after

---

[42]  Nine affiants who qualify as putative class members paid fees to attorneys.  *See* n.20, *supra*.

[43]  The affiants in this category are Donald Carano, Robert Attanasio, Robert Dell-Acquila, Clare Bisulca, Joe Zimmerman, and Gordon Johnson.  Memo. Ex. B at 2000037, 2000047, 2000059, 2000101, 2000119, 2000124.

[44]  The former group includes affiants David Lombardo, Tom Sammut, and Clare Bisulca. Memo. Ex. B at 2000034, 2000066, 2000101.

*McLaughlin* that the plaintiffs in this case cannot establish liability to the entire class through generalized proof. The fact that each putative class member will have a different story to tell in terms of reliance means that this is not a case in which liability can be demonstrated as to the class, requiring mini-trials only as to each class member's damages. Instead, it means that Cablevision may not be liable at all to some individuals who are members of the putative class, even if it is liable to other members.

In short, both new facts and new law demonstrate that the finding of predominance in *Class Cert. I* can no longer be sustained. The plaintiffs seek to assert a fraud-based claim in which neither the alleged misrepresentations nor the alleged victims' reliance is amenable to generalized proof. As a result, questions of fact that are common to the putative class do not "predominate over any questions affecting only individual members[.]" Fed. R. Civ. P. 23(b)(3); *see id*. advisory committee's note (1966 amendment) ("a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed"); *McLaughlin*, 522 F.3d at 223 (quoting same); *Moore*, 306 F.3d at 1253 (quoting same).

b.    Superiority

In its first ruling on class certification in this case, the court identified the legal test that continues to apply in determining whether a class action is superior to other methods of adjudication:

> A court should consider ... (1) the interest of the members of the class in individually controlling separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced; (3) the desirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action.

56

*Class Cert. I* at 16 (citing Fed. R. Civ. P. 23(b)(3); *Playmobil*, 35 F. Supp. 2d at 244). After reciting the plaintiffs' factual assertions as to why their claims satisfied that standard and the defendants' arguments to the contrary, *id*. at 16-17, the court appears to have accepted the former at face value: "Based on the Plaintiffs' claims that individual suits would be too costly and that managing a class action would not be problematic because common issues predominate, the Court finds that a class action is the superior method to adjudicate these claims." *Id*. at 17. Here again, the court should now reconsider that earlier finding because of an intervening change in both controlling law and operative fact.

When the court relied on the plaintiffs' unsupported assertions as to superiority, it "'assume[d] the truth of the plaintiff[s'] allegations.'" *Id*. at 2 (quoting *Mailloux v. Arrow Fin. Servs., LLC*, 204 F.R.D. 38, 40 (E.D.N.Y. 2001); citing *Weil v. Long Island Savings Bank, FSB*, 200 F.R.D. 164, 168 (E.D.N.Y. 2001); *Shelter Realty Corp. v. Allied Maint. Corp.*, 574 F.2d 656, 661 n.15 (2d Cir. 1978)). As a result of more recent case law, reliance on such an assumption is no longer allowed. Instead, the court must ensure that the plaintiffs have established the facts on which they rely for purposes of showing superiority, as it must with respect to each of the Rule 23 requirements, and in doing so it must require the plaintiffs to prove those facts by a preponderance of the evidence. *In re IPO*, 471 F.3d at 41; *Bombardier*, 546 F.3d at 202. Moreover, the court explicitly based the finding of superiority in *Class Cert. I* on an assumption that "common issues predominate[.]" *Id*. at 17. As explained above, that assumption has since been refuted. Accordingly, the court should consider the issue of superiority anew.

The plaintiffs argue that the first factor weighs in their favor because, in light of the small stakes at issue with respect to any single class member's claim, individual members would be

unable to retain counsel to prosecute their respective claims. Memo. at 23. I disagree to the extent that such argument ignores two important aspects of the RICO Act's remedial scheme: treble damages and the reimbursement of attorneys' fees. While such remedies do not necessarily raise the stakes sufficiently to ensure that individual class members will have an incentive to bring their own lawsuits, they significantly decrease the disincentives to such individual action. Nevertheless, I accept the plaintiffs' related argument as to the second factor; namely, that the relative absence of similar litigation tends to show the superiority of the class form. *See id.*

The remaining factors do not favor class certification. There is little if any need to concentrate the actions in a single forum, and in any event it is evident that most (if not all) of the individual class members' claims could be litigated within the local tri-state area, where the parties (with one apparent exception) and their attorneys are all located. Likewise, management of a class action in which there are so many individualized questions of proof is a strong reason to prefer individualized litigation. In essence, in light of the plaintiffs' claims and the nature of the allegations in the putative class members' respective affidavits, an adjudication of the parties' disputes in the form of a class action would require an individual mini-trial on the merits of each putative class member's civil RICO claim. By its nature, such an action would have virtually no advantage over separate trials, and would needlessly incur significant disadvantages arising from the litigation of so many separate questions of fact at once. I therefore respectfully recommend that the court decline to find that the plaintiffs' claims can be maintained as the type of class action described in Rule 23(b)(3).

III.    <u>Recommendation</u>

For the reasons set forth above, I respectfully recommend that the court deny with prejudice the plaintiffs' motion for class certification.

IV.    <u>Objections</u>

Any objection to this Report and Recommendation must be filed no later than February 17, 2009, absent an order extending that deadline.  Failure to file timely objections waives the right to appeal the District Court's order.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; *Beverly v. Walker*, 118 F.3d 900 (2d Cir. 1997); *Savoie v. Merchs. Bank*, 84 F.3d 52 (2d Cir. 1996).

**SO ORDERED.**

Dated: Brooklyn, New York
        February 2, 2009

<u>/s/ James Orenstein</u>
JAMES ORENSTEIN
U.S. Magistrate Judge

**ADDENDUM**

In the following table, I summarize for each of the plaintiffs' submitted affidavits the pages within Exhibit B to the plaintiffs' memorandum of law at which the affidavit can be found; the affiant's name; the city and state in which the affidavit was executed; the nature of the claimed violation of the FCA that the affiant asserts the defendant made against the affiant (that the affiant violated the FCA by merely owning a decoder device (denoted by the word "own"), by using the device for the latter unlawful purpose (denoted by the word "use"), or through both kinds of conduct (denoted by the word "both")); whether the affiant settled the claim, sought to defend it, or both; the amount that the defendants allegedly demanded in settlement; and the amount that the affiant allegedly paid (either in settlement, attorneys' fees, or both combined).

| Pages | Affiant's Name | City, State | Own/ use | Settle/ defend | Amt. Asked | Amt. Paid |
|-------|----------------|-------------|----------|----------------|------------|-----------|
| 2000001-03 | R. Forman[1] | Miller Place, NY | both | defend | $2,500 | $100 |
| 2000004-05 | G. Briffa | East Elmhurst, NY | use | defend | $60,000 | $0[2] |
| 2000006-08 | A. Kaufman | Las Vegas, NV | both | settle | $3,500 | $2,000 |
| 2000009-10 | A. Lubart | Brooklyn, NY | use | settle | $3,200 | $3,200 |
| 2000011-12 | P. Fusco | N. Woodmere, NY | use | settle | $5,000 | $5,000 |

---

[1] Mr. Forman apparently resides within the Eastern District of New York. Despite the fact that Cablevision has prosecuted many actions in this court based on alleged violations of the Communications Act, a review of the court's records reveals no such case involving a party named Robert Forman. The record of this case sets forth no information as to the resolution of the dispute with Cablevision that Mr. Forman describes in his affidavit.

[2] In describing his damages arising from the defendants' actions, Mr. Briffa says only that "[b]ecause of defending against Defendants' claims I suffered pecuniary harm and/or my credit rating has been adversely affected." *Id*. Such conclusory pleading – which does not say what he did to defend against the claims, nor how it could possibly have affected his credit rating – does not suffice. I note that the records of this court do reveal that CSC sued Mr. Briffa and that the case settled in 2004 before the court ever held a conference; however, the docket shows that Mr. Briffa represented himself in the case, and there is no mention of him paying any money to settle the case. *CSC Holdings, Inc. v. George Briffa*, No. 03-CV-5866 (SJF). I assume that if Mr. Briffa paid some specific sum in settlement, he would have said so in the affidavit he signed in 2005. Moreover, unlike other affiants, Mr. Briffa claims the defendants made a demand of "up to $60,000 to 'settle' their claims." *Id*. That assertion is inconsistent with the plaintiffs' theory that the defendants limited their demands to amounts "far smaller" than $10,000 as a "very carefully calculated 'breakpoint' that would strongly encourage the individuals to pay" rather than defend against the claim. Memo. at 2.

| Pages | Affiant's Name | City, State | Own/ use | Settle/ defend | Amt. Asked | Amt. Paid |
|---|---|---|---|---|---|---|
| 2000013-14 | W. Cohen | Cedarhurst, NY | use | settle | $3,500 | $3,500 |
| 2000015-17 | A. Lifieri | St. James, NY | both | settle | $3,000 | $2,500 |
| 2000018-19 | I. Sevelowitz | Putnam Valley, NY | use | settle | $2,500 | $2,500 |
| 2000020-21 | R. Bender | Merrick, NY | use | settle | $7,000 | $6,000 |
| 2000022-23 | M. Varvaro | Lindenhurst, NY | both | settle | $5,000 | $1,500 |
| 2000024-25 | T. Farrell[3] | Hauppauge, NY | use | settle | $30,000 | $5,000 |
| 2000026-27 | J. Michaels | East Meadow, NY | use | settle | $3,500 | $2,500 |
| 2000028-30 | R. Baraniecki | Nesconset, NY | both | settle | $3,000 | $1,000 |
| 2000031-32 | J. Tremark | Piscataway, NJ | use | settle | $2,500 | $2,500 |
| 2000033-35 | D. Lombardo | Copiague, NY | own | settle | $2,500 | $2,500 |
| 2000036-38 | D. Carano | S. Bound Brook, NJ | both | both | $3,500 | $2,800 |
| 2000039-40 | M. Ravo | Netcong, NJ | use | defend | $3,500 | $2,000 |
| 2000041-43 | M. Manfredonio | West Milford, NJ | both | settle | $2,500 | $2,500 |
| 2000044-45 | M. Rodrigues | Valley Stream, NY | use | settle | $500 | $500 |
| 2000046-48 | R. Attanasio | Amawalk, NY | both | both | $3,000 | $2,750 |
| 2000049-50 | L. Barkan[4] | Brooklyn, NY | both | settle | $3,500 | none |
| 2000051-52 | A. Fitzgerald | LaGrangeville, NY | use | settle | $2,000 | $1,000 |
| 2000053-55 | J. Justic | Woodmere, NY | both | settle | $3,500 | $1,500 |

[3] Mr. Farrell's assertion that the defendants demanded $30,000 in settlement is inconsistent with the plaintiffs' theory that the defendants limited their demands to amounts "far smaller" than $10,000 to dissuade defendants from doing anything other than settling quickly. Memo at 2.

[4] Mr. Barkan makes no claim of paying anything either in settlement or attorneys' fees. Despite appearing to reside in this district, a review of court records reveals that he has not been a party to any lawsuit in this court.

| Pages | Affiant's Name | City, State | Own/ use | Settle/ defend | Amt. Asked | Amt. Paid |
|---|---|---|---|---|---|---|
| 2000056-57 | A. Simon[5] | Woodmere, NY | use | both | $2,000 | $2,522 |
| 2000058-60 | R. Dell-Aquila | Miller Place, NY | both | both | $3,500 | $3,600 |
| 2000061-62 | E. Bakalis | Parsippany, NJ | use | both | $3,000 | $4,054 |
| 2000063-64 | P. Wasik | Milford, CT | use | settle | $2,000 | $2,000 |
| 2000065-67 | T. Sammut | West Islip, NY | own | settle | $2,000 | $2,000 |
| 2000068-70 | M. Shapiro | Kings Park, NY | both | settle | $3,000 | $1,000 |
| 2000073-75 | S. Dreishpoon | Coram, NY | both | settle | $3,500 | $1,700 |
| 2000076-78 | K. Flynn | Bayonne, NJ | use | both | $3,500 | $1,515 |
| 2000079-80 | K. Walter | Plainview, NY | use | settle | $1,000 | $1,000 |
| 2000081-82 | V. Donovan | Parsippany, NJ | use | settle | $3,000 | $2,000 |
| 2000083-84 | A. Loew | Weston, CT | use | settle | $1,500 | $1,500 |
| 2000085-87 | P. Grandinetti | Glen Rock, NJ | use | settle | $1,275 | $855[6] |
| 2000088-89 | R. Ceriello | Farmingdale, NY | use | settle | $1,500 | $1,500 |
| 2000090-91 | J. Frank | Levittown, NY | use | settle | $5,000 | $5,000 |
| 2000092-93 | S. Amodio | Ronkonkoma, NY | use | settle | $3,500 | $3,000 |
| 2000094-95 | J. Mendolia | Bay Shore, NY | use | settle | $1,500 | $1,500 |
| 2000096-97 | A. Storetveit[7] | Brookhaven, NY | use | defend | $2,500 | $2,500 |
| 2000098-99 | R. Capobianco | Locust Valley, NY | use | settle | $3,000 | $3,000 |

---

[5] The plaintiffs also submitted a second copy of Mr. Simon's affidavit. *Id*. at 2000071-72.

[6] Mr. Grandinetti agreed to pay $1,275, but thus far has only paid $855. *Id*. at 2000086.

[7] Mr. Storetveit claims to "have paid $1000.00 in attorney fees and [to] have incurred additional fees of $1500.00." *Id*. at 2000097. He does not specify the nature of those "additional fees" and nothing in the records of CSC's lawsuit against him in this court (which was settled without any court appearances), *see CSC Holdings, Inc. v. Storetveit*, No. 05-CV-0290 (JG), provides any information about what they may have been (except perhaps for the settlement amount itself).

| Pages | Affiant's Name | City, State | Own/use | Settle/defend | Amt. Asked | Amt. Paid |
|---|---|---|---|---|---|---|
| 2000100-01 | C. Bisulca | Selden, NY | own | both | unstated | $2,500 |
| 2000102-06 | F. Gulbrandsen[8] | Hicksville, NY | use | settle | $2,500 | $2,500 |
| 2000107-08 | L. Ertel | E. Rockaway, NY | use | settle | $3,500 | $2,500 |
| 2000109-10 | M. Sturm | New Hyde Park, NY | use | both | $10,500 | $8,425 |
| 2000111-13 | W. Byer | Rockville Centre, NY | both | settle | $3,500 | $2,000 |
| 2000114-15 | T. Fusaro | Staatsburg, NY | both | defend | $9,000 | $3,000 |
| 2000116-17 | N. Pierro | East Rockaway, NY | use | settle | $3,500 | $2,500 |
| 2000118-20 | J. Zimmerman | Deer Park, NY | both | both | $2,500 | $2,470 |
| 2000121-22 | A. Loffredo | West Babylon | use | settle | $3,500 | $3,000 |
| 2000123-25 | G. Johnson | Lakewood, NJ | both | both | $3,500 | $2,250 |
| 2000126-27 | G. Gooding | Highland Park, NJ | both | defend | $10,000 | $7,000 |
| 2000128-30 | H. Weiss | Brooklyn, NY | both | settle | $2,500 | $2,500 |
| 2000131-33 | B. Stein[9] | Baldwin, NY | both | settle | $5,000 | $6,000 |
| 2000134-36 | B. McManus | Massapequa, NY | both | settle | $3,500 | $2,500 |

---

[8] The plaintiffs have submitted two copies of Mr. Gulbrandsen's affidavit.

[9] Mr. Stein claims to have paid $6,000 to settle a claim for which the defendants demanded only $5,000, "[b]ecause [he] realized that the cost of defending ... would exceed the amount of their 'settlement' demand[.]" *Id*. at 2000132. It is obvious that the defendants cannot be held responsible for Mr. Stein's inexplicable decision to pay the defendants more than they demanded.